# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

EDWARD BRACEY,                                :
                                             :     CIVIL ACTION (HABEAS CORPUS)
      Petitioner,                    :
                                             :     No. 02-CV-3685
      v.                             :
                                             :     Hon. Berle R. Schiller
JEFFREY BEARD, et al.,                        :
                                             :     **This is a capital case**
      Respondents,                   :
                                             :

# ORDER

And now, this _____ day of _____, upon consideration of Petitioner's Motion for Discovery and the accompanying Memorandum of Law, and Respondents's response thereto, it is hereby ORDERED that Petitioner's Motion for Discovery is GRANTED.   Respondents shall provide Petitioner with copies of and information relating to:

    1.  Any and all notes, documents, memoranda, or reports (including recorded on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession or control of the Commonwealth regarding the jury selection proceedings in this case.

    2.  Any and all notes, documents, memoranda, or reports (including recorded on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession or control of the Commonwealth regarding the jury selection proceedings in any other homicide cases prosecuted by Judith Rubino, the trial prosecutor in this case.

    3.  Any and all notes, documents, memoranda, or reports (including recorded on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession or control of the Commonwealth regarding the jury selection policies and practices of the Philadelphia District Attorney's office during the years in which the trial prosecutor, Judith Rubino, has served as a homicide prosecutor in that office.

    4.  Any and all records relating to training sessions on jury selection provided by or under the auspices of the Philadelphia District Attorney's office, including notes, documents, memoranda, or reports (recorded on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession or control of the Commonwealth covering the years during which the trial prosecutor, Judith Rubino, has served as a homicide prosecutor in that office.

BY THE COURT:

_____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD BRACEY, | CIVIL ACTION (HABEAS CORPUS) |
| Petitioner, | |
| | No. 02-CV-3685 |
| v. | |
| | Hon. Berle R. Schiller |
| JEFFREY BEARD, et al., | |
| | **This is a capital case** |
| Respondents, | |

## PETITIONER'S MOTION FOR DISCOVERY

Petitioner, Edward Bracey, through undersigned counsel, moves for discovery and states as follows:

### Introduction

1.      Petitioner is death-sentenced Pennsylvania prisoner who, having exhausted state remedies, has instituted proceedings seeking federal habeas corpus relief from his conviction and death sentence.

2.      Petitioner was found guilty of first degree murder and related charges on March 3, 1992, after a jury trial in the Philadelphia Court of Common Pleas (Biunno, J., presiding). Following a cursory capital sentencing hearing, he was sentenced to death later that same day. Commonwealth v. Bracey, June Term, 1991, Nos. 3282-3288 (Philadelphia C.P., Crim. Div.). Post-verdict motions were denied, and he was formally sentenced to death on March 4.[1]

---

[1] Mr. Bracey was represented by court-appointed counsel, William Perrone, in all proceedings in the Court of Common Pleas. Mr. Perrone was subsequently disbarred for fraudulent billing practices during the time period that encompassed his representation of Mr.

3.      The Pennsylvania Supreme Court affirmed Mr. Bracey's convictions and sentence

on direct appeal on July 21, 1995. Commonwealth v. Bracey, 541 Pa. 322, 662 A.2d 1062

(1995).

4.      The United States Supreme Court denied his timely filed petition for writ of

certiorari on April 1, 1996. Bracey v. Pennsylvania, 517 U.S. 1122 (1996).[2]

5.      Mr. Bracey filed a *pro se* petition for state post-conviction relief on May 10,

1996[3] and a counseled *Petition for Habeas Corpus Relief under Article I, Section 14 of the*

*Pennsylvania Constitution and for Statutory Post-Conviction Relief under the Post Conviction*

*Relief Act ("PCRA Petition")* on November 22, 1996.  His *PCRA Petition* included a claim that

prosecutor Judith Rubino had exercised peremptory challenges in a discriminatory manner.

*PCRA Petition*, Claim VIII.[4]

---

Bracey.  His fraudulent billing encompassed eleven days for which he submitted bills for this
case in which the total bills for all his Philadelphia court appointments exceeded 24 hours, as
well as a total of thirty days for which he billed for this case in which he claimed to have worked
more than 20 hours on Philadelphia court appointments.

[2]  Although  on September 26, 1995 the United States Supreme Court had granted Mr.
Bracey until December 18, 1995 to seek certiorari, Governor Thomas Ridge signed a premature
death warrant on November 13, 1995 scheduling Mr. Bracey to be executed on December 5,
1995.  On December 1, 1995, the Pennsylvania Supreme Court granted a stay of execution to
vindicate his right to seek certiorari. Commonwealth v. Bracey, 543 Pa. 15, 669 A.2d 882
(1995).

[3]  Governor Thomas Ridge signed a second premature death warrant on April 26, 1996.
That warrant scheduling Mr. Bracey's execution for May 12, 1996, more than 10½ months
before the one-year statutory time frame in which he was permitted to initiate state post-
conviction review of his case.  The Philadelphia Court of Common Pleas issued a stay of
execution on May 10, 1996.

[4]  Ms. Rubino is the same prosecutor as in Hardcastle v. Horn, 2001 WL 722781, 2001
U.S. Dist. LEXIS 8556 (E.D. Pa. June 27, 2001), in which the district court granted capital
habeas corpus relief as a result of her discriminatory exercise of peremptory challenges against

6.    The PCRA Court granted an evidentiary hearing limited to Mr. Bracey's claim of ineffective assistance of sentencing-stage counsel, and dismissed all other claims without a hearing. It did not permit evidentiary development of the jury discrimination claim.

7.    On July 24, 1998, Petitioner filed a *Motion For a New Trial Based on Newly Discovered Evidence* ("*Motion for New Trial*"), presenting constitutional claims arising out of new evidence of systemic racial discrimination in the administration of the death penalty in Philadelphia and in the Philadelphia District Attorney's jury selection practices. The Philadelphia Court of Common Pleas' PCRA Unit stamped this pleading "received," but refused to accept it for formal filing.[5] The PCRA Court denied relief on July 28, 1998. Mr. Bracey moved for reconsideration based upon the issues presented in the July 24, 1998 *Motion for New Trial*. The PCRA Court denied the motion for reconsideration on September 3, 1998, and reissued its opinion on September 21, 1998.

8.    Mr. Bracey appealed the denial of PCRA relief to the Pennsylvania Supreme Court. On or about March 11, 1999, Mr. Bracey also filed a *Motion for New Trial Based on Newly Discovered Evidence, Petition For Habeas Corpus Relief Pursuant to Article I, Section 14 of the Pennsylvania Constitution and Statutory Post-Conviction Relief Under 42 Pa. C.S. § 9542 et seq. and Motion for Remand to the Trial Court for Evidentiary Hearing* ("*Remand Motion*"), once again presenting new evidence of racial discrimination in the administration of the death penalty in Philadelphia and in the city prosecutors' exercise of peremptory challenges. The

---

black jurors.

    [5] It also refused to accept for formal filing similar pleadings in more than a dozen other capital cases.

Pennsylvania Supreme Court denied his appeal on December 31, 2001, <u>Commonwealth v. Bracey</u>, 795 A.2d 935 (Pa. Dec. 31, 2002); denied reargument on April 18, 2002; and denied his *Remand Motion* on May 8, 2002.

9.      On May 17, 2002, the Commonwealth issued a third legally premature death warrant, this time scheduling Mr. Bracey's execution for July 11, 2002.  This Court granted Petitioner's motion for a stay of execution, appointed the Defender Association of Philadelphia - Federal Court Division to represent him in these capital habeas corpus proceedings, and directed that counsel file a habeas corpus petition on his behalf.

10.      Congress has enacted a one-year statute of limitations, commencing with the completion of direct review, in which a state prisoner may file a petition for writ of habeas corpus.  28 U.S.C. § 2244(d).  Petitioner's statute of limitations expires on March 10, 2003.[6]

### Nature of Request for Discovery

11.      As referenced above, one of the issues Petitioner presented to Pennsylvania's state courts alleged that the prosecution discriminatorily exercised its peremptory challenges in this case, in violation of the Sixth, Eighth, and Fourteenth Amendments.  (In the PCRA court, see PCRA Claim VIII; *Motion for New Trial Based on Newly Discovered Evidence and Petition For Habeas Corpus Relief Pursuant to Article I, Section 14 of the Pennsylvania Constitution and Statutory Post-Conviction Relief under 42 Pa. C.S. § 9542 et Seq.*, Claim I-A, at 9 ("*Motion for New Trial*").  In the Pennsylvania Supreme Court, see PCRA Appeal, Issue VIII; *Motion For New Trial Based on Newly Discovered Evidence, Petition For Habeas Corpus Relief Pursuant to*

---

[6] If the pendency of his *Remand Motion* continued to toll the statute of limitations, Petitioner would have until March 30, 2003 to file.

*Article I, Section 14 of the Pennsylvania Constitution and Statutory Post-Conviction Relief*

*Under 42 Pa. C.S. § 9542 et seq, and Motion For Remand to The Trial Court For Evidentiary*

*Hearing*, Claim I-A ¶¶ 24-34 ("*Remand Motion*")).  He specifically pled that the state courts

should reach the issue on its merits pursuant to the long-established "relaxed waiver" rule in

capital cases, PCRA Claim XV, and further alleged that counsel -- who raised this issue at trial --

was ineffective for failing to pursue it on appeal.  PCRA Claims VIII, XIV; PCRA Appeal, Issue

VIII, XVII.  In addition, he proffered new evidence concerning the Philadelphia District

Attorney's and the trial prosecutor's historic pattern and practice of racial discrimination in jury

selection.  E.g., *Motion for New Trial*; *Remand Motion*; PCRA Appeal, Issue VIII, n.12.

12.    Petitioner has continued to investigate and develop facts in support of that claim.

After reviewing the state court record and conducting further investigation, counsel believe and

aver that there exist other documents, records, and information in the actual or constructive

possession or control of the Commonwealth and/or its agents that are necessary for full and fair

presentation of this claim.  Petitioner therefore seeks discovery regarding the following:

a.    Any and all notes, documents, memoranda, or reports (including recorded

on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession

or control of the Commonwealth regarding the jury selection proceedings in this case.

b.    Any and all notes, documents, memoranda, or reports (including recorded

on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession

or control of the Commonwealth regarding the jury selection proceedings in any other homicide

cases prosecuted by Judith Rubino, the trial prosecutor in this case.

c.    Any and all notes, documents, memoranda, or reports (including recorded

on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession

or control of the Commonwealth regarding the jury selection policies and practices of the

Philadelphia District Attorney's office during the years in which the trial prosecutor, Judith

Rubino, has served as a homicide prosecutor in that office.

        d.      Any and all records relating to training sessions on jury selection provided

by or under the auspices of the Philadelphia District Attorney's office, including notes,

documents, memoranda, or reports (recorded on paper, audiotape, videotape, electronic, or other

form) in the actual or constructive possession or control of the Commonwealth covering the

years during which the trial prosecutor, Judith Rubino, has served as a homicide prosecutor in

that office.

### Nature of the Jury Discrimination Claim

**A.**      **The Law**

13.     The Equal Protection Clause of the United States Constitution forbids the

prosecutor from striking potential jurors on account of their race or on the assumption that

African-American jurors will be unable to impartially consider the prosecution's case against an

African-American defendant. Batson v. Kentucky, 476 U.S. 79 (1986).

14.     Batson set forth a three-step test to determine the whether the state

discriminatorily employed its peremptory challenges. Batson, 476 U.S. at 96-98; Riley v. Taylor,

277 F.3d 261, 275 (3d Cir. 2001) (en banc); Simmons v. Beyer, 44 F.3d 1160, 1167 (3d Cir.

1995); Hardcastle v. Horn, 2001 WL 722781, *15 (E.D. Pa. June 27, 2001).

        a.      Under step one, the defendant must establish a *prima facie* case of

discrimination by showing that "he is a member of a cognizable racial group, and that the

6

prosecutor has exercised peremptory challenges to remove from the venire members of the

defendant's race." Batson, 476 U.S. at 96 (citations omitted). "[T]he defendant is entitled to rely

on the fact . . . that peremptory challenges constitute a jury selection practice that permits 'those

to discriminate who are of a mind to discriminate.'" Id. (quoting Avery v. Georgia, 345 U.S.

559, 562 (1953)). The defendant also is entitled to present "any other relevant circumstances

[that may] raise an inference" that the prosecutor exercised her peremptory challenges to strike

individual jurors on the basis of race. Id. A pattern of prosecutorial strikes against black jurors

may in itself be sufficient to raise an inference of discrimination, Batson, 476 U.S. at 98; United

States v. Alvarado, 923 F.2d 253, 256 (2d Cir. 1991) (strike rate "nearly twice the likely minority

percentage of the venire strongly supports a prima facie case under Batson"), although the

exclusion of even a single juror on the basis of race may be sufficient to establish a *prima facie*

case. E.g., United States v. Clemons, 843 F.2d 741, 747 (3d Cir.), cert. denied, 488 U.S. 835

(1988).

        b.     Once the defendant establishes a prima facie case, step two of the Batson

inquiry requires the prosecutor to supply a race-neutral reason related to the circumstances of the

case for excluding *each* prospective juror. Batson, 476 U.S. at 98. This step of the Batson

inquiry requires "the prosecutor [to] give a 'clear and reasonably specific' explanation of [her]

'legitimate reasons' for exercising the challenges." Batson, 476 U.S. at 98 n.20; Harrison v.

Ryan, 909 F.2d 84, 88 (3d Cir. 1990).

        c.     Step three requires the reviewing court to determine whether the reasons

offered by the prosecution are race-neutral and whether the defendant has established a case of

purposeful discrimination. Batson, 476 U.S. at 98; Riley v. Taylor, 277 F.3d at 275.

15.    Petitioner has developed substantial evidence that the prosecution exercised its peremptory challenges in a racially discriminatory manner in this case.

**B.    Jury Selection in this Case**

16.    First, this was an extremely racially sensitive, highly publicized, and emotionally charged case.[7] Mr. Bracey, a black male, was charged with shooting to death a white male police officer and the prosecution exercised numerous peremptory challenges against black jurors. E.g., Prosecutor Rubino struck the first four black jurors she had the opportunity to select for jury service in this case, Diane M. Richardson (juror 352), Bertha A. Gause (juror 151), P. Pauline Arrington (juror 010), and James H. Nettles (juror 309).[8] When counsel objected to the fourth consecutive strike of a black jurors, the trial court said to the prosecution --

> I want a reason. Because the law, as we well know, is not equally structured. The statue of the lady of justice with her eyes blind-folded and the scales equally set is very inaccurate . . . . so give me -- I want to know why you struck this person.

N.T. 2/7/92 at 64. From that point forward, with one exception, the court required Ms. Rubino to explain the reasons for her subsequent strikes against black jurors.

---

[7] Indeed, nine jurors or alternates who had been empaneled were later excused, eight of them after being exposed to prejudicial pretrial publicity. Empaneled juror number 1, Barbara Proud, was excused by agreement on February 6, 1992. Empaneled jurors numbers 3 (Mildred Bilt), 4 (Brian T. Doak), 5 (Rendell L. Ship), 6 (Guillermo Ulmos), 8 (Joseph Sadowski), 10 (Susan Gallagher), 11 (Oscar Spragins), and 16 (Joseph P. McShane) were exposed to prejudicial pretrial publicity.

[8] Jury selection began on the afternoon of February 5, 1992. See Court of Comon Pleas Voir Dire Sheet, attached. Ms. Rubino struck the first two jurors she had the opportunity to accept that day -- Ms. Richardson and Ms. Gause, both black. All of the jurors she had the opportunity to accept or strike the rest of that afternoon and on February 6 were white. Then on February 7, Ms. Rubino again struck the first two jurors who were not excused for cause -- Ms. Arrington and Mr. Nettles (juror 309). They were jurors 1, 3, 38, and 40 in the first panel of jurors summoned for the case on February 5. See Court Summons List.

8

17.    Under the glare of this fourth strike and the court's demand for an explanation, Ms. Rubino finally did accept a black juror – Rendell L. Shipp – the very next juror following the exclusion of Mr. Nettles.  (Mr. Shipp was later excused as a result of his exposure to prejudicial pretrial publicity.)

18.    Having observed conduct that had raised an inference of discrimination sufficient for the court to demand an explanation for striking Mr. Nettles, the trial court erroneously failed to require the prosecution to provide race-neutral explanations for its peremptory strikes against Ms. Richardson, Ms. Gause, and Ms. Arrington, and of juror 115, Earl James, II,[9] late in the afternoon of February 13.[10]

19.    The circumstances of the voir dire strongly support an inference that racial considerations prompted the unexplained strikes of these black prospective jurors.  For instance, three of the stricken jurors possessed characteristics that normally would be favored by the Commonwealth.  Ms. Richardson's sister had recently been the victim of a crime and had been a witness for the prosecution in that case.  N.T. 2/5/92 at 51, 58.  In a case involving the killing of a law enforcement officer, Ms. Arrington worked part-time as a security guard, N.T. 2/5/92 at 65-66, and Mr. James had previously worked as a security guard, N.T. 2/13/92 at 164-66.

20.    Moreover, the circumstances surrounding the prosecution's *selection* of black

---

[9]  Mr. James was the sixth juror on the panel of jurors summoned on Thursday, February 13.

[10]  Judge Biunno required the prosecutor to articulate reasons for challenging six prospective black veniremembers.  The court accepted these explanations as race-neutral.  N.T. 2/7/92 at 62-66; N.T. 2/10/92 at 130-31; N.T. 2/11/92 at 109-11; N.T. 2/13/92 at 29-32; N.T. 2/18/92 at 144-45; N.T. 2/19/92 at 103-04.  Petitioner has contended, and will argue in this Court, that at least several of the proffered explanations were pretextual.

jurors is equally suspicious. Ms. Rubino appeared to accept black jurors only when her conduct was at issue. Thus, Rendell Shipp was selected only after it had become clear that Ms. Rubino had just struck the first four black jurors in the case. Similarly, after her only peremptory challenges from February 13 through February 18 had been exercised against black jurors, and the excusal of eight jurors on the 18th who had been exposed to the prosecutor's inflammatory pre-trial comments in the press left a venire that was 88.9% white,[11] Ms. Rubino suddenly accepted the next three available black jurors. Up to that time, she had struck three-quarters of all the available black jurors (9 of 12). And immediately thereafter, Ms. Rubino bitterly complained -- with argument exuding race consciousness -- when defense counsel challenged her peremptory strike of the first available black alternate juror:

> Your Honor, the last three jurors selected were black. I don't understand what counsel's problem is. . . . One third of the jury is black. She would only have been an alternate.

N.T. 2/19/92 at 103-04.

### C.    Statistical Patterns of Discrimination in this Case

21.    Apart from the language of the voir dire, the overall statistical pattern of prosecutorial strikes strongly suggests that prosecutor Rubino discriminatorily exercised her peremptory strikes against black jurors. Prior to February 19, Ms. Rubino had accepted 33 jurors. 29 (87.9%) were white, while only three (9.1%) were black. She had accepted 78.4% of white jurors (29 of 37), while striking 75% of black jurors (9 of 12). She was *three-and-one-half times* more likely (3.47) to strike a black juror than a white juror (75%/21.6%), and black jurors faced odds of being struck (3:1) that were *7.25 times greater* than the odds that a white juror

_____

[11]  Eight white and only one black juror.

10

would be struck (12:29). Even giving the prosecution the statistical benefit of accepting three black jurors and one black alternate after the pre-trial publicity incident on February 18, the statistical evidence strongly suggests discrimination.

22.      During voir dire, the Commonwealth had an opportunity to accept or strike sixty (60) jurors. Forty-one (41) of those jurors (68.3%) were white; 28.3% (17) were black; and 3.3% (2) were Latino. The prosecution accepted forty (40) jurors and struck twenty (20). Eighty percent of the jurors accepted by the prosecution (32) were white; while only 17.5% (7 jurors) were black; and 2.5% (1) were Latino. The prosecution struck twenty (20) jurors. More than half the jurors stricken by the prosecution were racial or ethnic minorities: fully half of the jurors stricken by the prosecution (10) were black and one (5%) was Latino; nine of the stricken jurors (45%) were white.

23.      While the prosecution accepted 32 of the 41 white jurors (a 78.1% acceptance rate), it struck 10 of 17 black jurors (a 58.8% strike rate). The odds that a white juror would be accepted were 3.56:1, but the odds that a black juror would be accepted were only 0.7:1. Thus, white jurors were 2.68 times more likely than black jurors to be acceptable to the prosecution, while black jurors faced odds of being struck that were *more than five times greater* (5.08) than those faced by white jurors. Black male jurors were struck with *more than two-and-three-quarters times* the frequency (2.78) of white male jurors (33.3%/12.0%), and faced odds of being struck that were *three-and-two-thirds times greater* (3.67) than white male jurors (0.5/0.136). Black female jurors were struck at *nearly twice* the rate (1.94) of white females (72.3%/37.5%), and faced odds of being struck that were almost *four-and-one-half times greater* (4.44) than white female jurors (2.67/0.6). And black female jurors were struck with *more than six times* the

11

frequency (6.1) of white males, and faced odds of being struck that were *nearly twenty times greater* (19.56) than white males.

24.    The discrimination faced by individual black jurors -- both male and female -- is also reflected in the proportion of minority jurors in the overall venire. While black jurors comprised only 28.3% (17 of 60) of the general venire from which the prosecution had the opportunity to select jurors, they comprised half of the jurors struck (10 of 20) and only 17.5% (7 of 40) of the jurors accepted by the Commonwealth. Thus, black jurors appeared in the universe of jurors whom the prosecution struck with 1.764 times greater frequency than they appeared in the available venire (50%/28.3%). The proportion of black jurors in the available venire also was 1.619 times greater than among those jurors whom the prosecution accepted for jury service in this case (28.3%/17.5%). The racially disproportionate impact of the prosecution's peremptory strikes is further illustrated by the fact that the representation of black jurors among the jurors the prosecution struck (50%) was 2.857 times higher than the representation of black jurors among the jurors the prosecution accepted (17.5%)

25.    This pattern of discrimination applied to both male and female jurors. Of the 27 female jurors whom the prosecution had an opportunity to accept or strike, 40.7% were black (11). Yet blacks comprised 57.1% of all female jurors struck (8 of 14), while only 23.1% (3 of 13) of female jurors whom the prosecution accepted were black. Thus, black jurors appeared in the universe of female jurors whom the prosecution struck with 1.402 times greater frequency than they appeared in the available venire (57.1%/40.7%). The proportion of black jurors among available female veniremembers was more than one-and-three-quarters times higher (1.765) than among female veniremembers the prosecution accepted for jury service in this case

12

(40.7%/23.1%). The representation of black jurors among the female veniremembers the prosecution struck (57.1%) was nearly two-and-one-half times (2.476) the representation of black jurors among the female jurors the prosecution accepted (23.1%).

26.    Of the 33 male jurors whom the prosecution had an opportunity to accept or strike, 18.2% were black (6). Yet one-third of all male jurors struck were black (2 of 6), while only 14.8% (4 of 27) of male jurors whom the prosecution accepted were black. Thus, black jurors appeared in the universe of male jurors whom the prosecution struck with 1.833 times greater frequency than they appeared in the available venire (33.3%/18.2%). The proportion of black jurors among available male veniremembers also was 1.227 times greater than among male veniremembers whom the prosecution accepted for jury service in this case (18.2%/14.8%). The representation of black jurors among the male veniremembers the prosecution struck (33.3%) was 2.25 times higher than the representation of black jurors among the male jurors the prosecution accepted (14.8%).

### D.    The Trial Prosecutor's Historical Pattern and Practice of Discrimination in Capital Cases

27.    In addition to her conduct in this case, Prosecutor Rubino has exhibited an historic pattern and practice of excluding black jurors that provides additional evidence of the constitutional violation in this case. See Batson, 476 U.S. at 94 ("Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the "result bespeaks discrimination."). Evidence of a prosecutor's prior practices has long been deemed appropriate in proving jury discrimination claims. Swain v. Alabama, 380 U.S. 202, 227-28 (1965) (a defendant who "attack[s] the prosecutor's systematic use of challenges against Negroes should

13

. . . establish on the record the prosecutor's conduct in this regard, especially where the same

prosecutor for many years is said to be responsible for this practice and is quite available for

questioning on this matter"); Griffith v. Kentucky, 479 U.S. 314, 318 (1987) ("an inference of

purposeful discrimination could be raised [under Swain] where a prosecutor had engaged in a

pattern of challenging black jurors in a series of cases" (citing Swain, 380 U.S. at 223-24)).[12]

28.    First, Ms. Rubino has discriminated -- and been found to have discriminated -- in

capital case jury selection. See Hardcastle v. Horn, 2001 WL 722781, *17-*18, 2001 U.S. Dist.

LEXIS 8556 (E.D. Pa. June 27, 2001) (Padova, J.) (finding that prosecutor Rubino exercised

peremptory challenges to intentionally discriminate against six African-American jurors). In that

case, Commonwealth v. Hardcastle, No. 3288, June Term, 1982 (Phila. C.P.), Ms. Rubino not

only struck jurors on the basis of race, but objected to defense efforts to excuse jurors who

---

[12] Batson reduced the evidentiary burden on a defendant by eliminating the requirement that such systemic proof be provided, but it remains relevant evidence of discriminatory intent. The United States Supreme Court has explained:

> Batson dropped the Swain requirement of proof of prior discrimination, holding it possible for a defendant to make out a prima facie equal protection violation entirely by reference to the prosecution's use of peremptory challenges in the circumstances of the defendant's own case. 476 U.S., at 92-98.
>
> Because *Batson did not change the nature of the violation recognized in Swain, but merely the quantum of proof necessary to substantiate a particular claim*, it follows that a defendant alleging a violation of equal protection of the law under Swain necessarily states an equal protection violation subject to proof under the Batson standard of circumstantial evidence as well. Thus, from the determination by the [state court] that petitioner raised a claim under Swain, it follows that he raised an equal protection claim subject to the more lenient burden of proof laid down in Batson.

Ford v. Georgia, 498 U.S. 411, 420 (1991) (parallel citations omitted, emphasis added).

14

exhibited racial bias against blacks.[13]  During the course of arguing that she had not

discriminatorily exercised peremptory challenges, she employed a startling mixture of racially

and religiously insensitive stereotypes:

> I don't know if the people I think are black are black. . . . If I may finish, your
> Honor, some people may think Mr. Fitzpatrick's white, Jewish partner is black
> because she happens to have curly hair. . . . I said I would agree, and I did agree
> on the record, that 12 of the 14 [jurors she peremptorily struck], from my view
> were black.

Hardcastle N.T. 4/27/83, at 44-46.

29.    Second, Respondents have admitted that the prosecutor's files in at least two

capital cases prosecuted by Ms. Rubino contain notes evidencing a consciousness of race.

Commonwealth v. Tilley, Dec. Term, 1985, Nos. 1078-82, *Commonwealth's Motion to*

*Reconsider Discovery Order of July 21, 1999,* ¶ 2 (files include "personal hand-written notes of

the prosecutor that contain information pertaining to the racial composition of the jury panel.");

Hardcastle v. Horn, 98-CV-3028 (E.D. Pa.), *Response to Petitioner's Reply Brief* (filed January

---

[13]  During the voir dire in Hardcastle, prospective juror Gisela J. Broughton informed the
court that she had twice been the victim of crime, and then stated that her experiences as a victim
would affect her ability to fairly deliberate: "I think I am a little prejudiced right at this point
because both times that this has happened, it has been a black person, and I just feel a little bit
uneasy about that. . . I was always open minded and all, but since two things happened to me,
both times it was black people, I feel a little bit on the prejudiced side."  The prosecution
objected when the defense challenged Ms. Broughton for cause.  The Court granted the motion to
excuse for cause.  Hardcastle N.T. 11/16/82, at 2.65-2.72.  The District Court found that Ms.
Rubino's "support for the retention of a juror who admitted to being racially-biased against
African-Americans is probative of the prosecutor's state of mind during voir dire."  Hardcastle,
2001 WL 722781, at *16.

Similarly, Ms. Rubino objected to the defense challenge for cause of another white juror,
Mary J. Fonder, who had twice been the victim of interracial crime, and therefore admitted to
fears that her neighborhood was "changing" from "white to negro."  Hardcastle N.T. 11/16/82, at
1.73-1.83.

2001) (admitting that prosecutor's notes contain information on race of jurors struck).

30.     Third, as set forth in more detail below, statistical evidence demonstrates that Ms.

Rubino has systematically excluded prospective African-American venire persons from jury

service in capital cases at a rate more than triple that of other jurors.

31.     Petitioner has identified from the database of first-degree murder cases maintained

by the Administrative Office of the Pennsylvania Courts 24 homicide cases prosecuted by Ms.

Rubino,[14] and has compiled the peremptory strike rates in 23.[15] He had been able to preliminarily

---

[14] While these are all of the Rubino homicide cases Petitioner has been able to identify to date, they do not exhaust the entire universe of homicide cases prosecuted by Ms. Rubino. Consequently, Petitioner seeks discovery from the Commonwealth of the identity of all homicide prosecutions not identified in this pleading in which juries were empaneled by Ms. Rubino.

[15] The cases are:  Commonwealth v. Jacqueline Massey, No. 1967, Dec. Term, 1981; Commonwealth v. Donald Hardcastle, No. 3288, June Term, 1982; Commonwealth v. Anthony Joyner, No. 1760, Sept. Term, 1983; Commonwealth v. Tyrone Richardson, No. 1214, Apr. Term, 1984; Commonwealth v. Clifford Williams, No. 3649, July Term, 1985; Commonwealth v. Dennis Baxter, No. 3637, Apr. Term, 1987; Commonwealth v. William Welch, No. 614, Nov. Term, 1987; Commonwealth v. Nathaniel McNair, No. 2459, Dec. Term, 1987; Commonwealth v. James Green, No. 1513, Oct. Term, 1988; Commonwealth v. Michael Pierce, No. 1312, Aug. Term, 1989; Commonwealth v. Leonard Christopher, No. 3551, June Term, 1990; Commonwealth v. Lawrence Rhoads, No. 477, Sept. Term, 1990; Commonwealth v. Warren Henderson, No. 3361, Nov. Term, 1990; Commonwealth v. Gilbert Jones, No. 3523, Feb. Term 1991; Commonwealth v. Edward Bracey, No. 3282, June Term, 1991; Commonwealth v. Carlos Matos, No. 1105, Jan. Term, 1992; Commonwealth v. Joseph Dallasta, No. 2228, Mar. Term, 1992; Commonwealth v. Lawrence Jones, No. 4378, June Term, 1992; Commonwealth v. Alexander Keaton, No. 1925, Mar. Term, 1993; Commonwealth v. Jamal Allen, No. 3508, Mar. Term, 1993; Commonwealth v. Steven Scott (trial date 6/17/1993), Commonwealth v. Brown (trial date 8/7/1995), and Commonwealth v. Larry B. Cooper (trial date 4/27/1981).  Petitioner also has identified a 24th case, Commonwealth v. Tilley, Dec. Term, 1985, Nos. 1078-82, in which Respondent has admitted that Ms. Rubino took notes concerning the race of the jurors. See Commonwealth's Motion to Reconsider Discovery Order of July 21, 1999, Commonwealth v. Tilley, ¶ 2 (files include "personal hand-written notes of the prosecutor that contain information pertaining to the racial composition of the jury panel").
The Pennsylvania Supreme Court overturned a trial court's order to disclose these notes in that case on the grounds that Mr. Tilley was white and his jury discrimination claim was not cognizable because he sought to retroactively apply the Batson doctrine to white defendants.

33.    Petitioner has been able to determine that, throughout the entire period covered by the study, Assistant District Attorney Judith Rubino peremptorily struck venirepersons known to be African American 62.12% of the time she had an opportunity to do so (182 strikes of 293 prospective jurors; odds of 1.64:1).[17]  By contrast, she exercised peremptory strikes against venirepersons who are known to be non-African American in only 18.66% of her opportunities to do so (81 of 434; odds of 1:4.35).  Consequently, as of the time of this filing, the data reveal that Ms. Rubino *was nearly three-and-one-third times more likely (3.328)* to peremptorily strike an African-American venireperson called for jury duty in a homicide prosecution than a

---

of strikes involving jurors whose race is known, as well as those involving jurors whose race is known and/or reliably imputed.  Nonetheless, they and Petitioner are entitled to base their opinions on as much and as accurate information as possible about the race of individual jurors. Even though Petitioner has been able to identify the race of more than 120 of the jurors in Ms. Rubino's cases for which voter registration information was not available, Petitioner still does not know the race of 170 jurors (19.0%) in those venires.  However, some substantial portion of this information should be available from Respondents because of the documented policy and practice that city prosecutors -- including Ms. Rubino -- kept notes of the race of potential jurors in homicide cases.  E.g., D.A. Training Tape, at 66; Diggs v. Vaughn, 1991 WL 46319, *1-2 (E.D. Pa. Mar. 27, 1991) ("The record demonstrates conclusively that, at each trial, the prosecutor [the Chief of the Homicide Unit] kept careful records of the race of each prospective juror, and a running tally of how many persons of each race remained on the venire for possible selection."); Sistrunk v. Vaughn, No. 90-CV-1415, Magistrate's Report & Recommendation (E.D. Pa. Aug. 10, 1995) (Powers, Chief M.J.); Hardcastle v. Horn, 98-CV-3028 (E.D. Pa.), *Response to Petitioner's Reply Brief* (filed January 2001) (admitting that prosecutor Judith Rubino's notes from 1982 prosecution contain information on race of jurors struck); *Commonwealth's Motion to Reconsider Discovery Order of July 21, 1999*, Commonwealth v. Tilley, ¶ 2 (files include "personal hand-written notes of the prosecutor that contain information pertaining to the racial composition of the jury panel").  Consequently, Petitioner seeks discovery of Ms. Rubino's notes concerning the selection of jurors in her homicide prosecutions.

[17]    The strike rate was calculated by dividing the number of peremptory challenges actually exercised by the number of prosecutorial opportunities to exercise peremptory strikes. For example, if the prosecutor could have struck 12 jurors from a venire and exercised peremptory challenges against 5 of those jurors, the strike rate for that trial would be 5/12, or 41.67%.  Odds are calculated by dividing the number of jurors struck by the number of jurors accepted.  In the above example, a juror's odds of being struck would be 5:7 or 1:1.4.

venireperson who was not black. And jurors Petitioner can identify as being black faced odds of being struck by Ms. Rubino that were more than seven (7.15) times greater than all other jurors whose race Petitioner can identify.

34.    Indeed, throughout the period of the study, Prosecutor Rubino was more than 10% more likely (13.17%)[18] to strike black jurors than the Philadelphia District Attorney's office as a whole, and nearly 20% (18.37%)[19] less likely to strike non-black jurors than the Philadelphia District Attorney's office as a whole. *The overall racial disparity in her exercise of peremptory challenges was 1.37 times greater than the already highly discriminatory rate at which the office as a whole exercised peremptory challenges.*[20]

35.    Those strikes of jurors whose race is known are listed below:[21]

---

[18]  Her 62.12% rate of peremptorily striking African-American jurors exceeded the office's rate of 54.89% by 7.23, or by 13.17% of the office strike rate.

[19]  Her 18.66% rate of of striking non-black jurors was lower than the office's rate of 22.86% by 4.20, or by 18.37% of the office strike rate.

[20]  Ms. Rubino was 3.328 times more likely to strike blacks than other prospective jurors, while the District Attorney's office as a whole was 2.40 times more likely to strike blacks than other prospective jurors.

[21]  Individual venire members were not included in this chart unless the researchers had information that they considered 98% or more valid, based upon direct evidence in court records, self-reported designations in voter registration rolls, and census-based evidence that the venire member's neighborhood was either less than 2% or greater than 98% black. Petitioner has been able to obtain some additional information on Ms. Rubino's strikes that the researchers have not yet had the opportunity to incorporate into their database.

| Defendant | Def. Race | Victim Race | Black Str | Black Tot | Black % | Non-Black Str | Non-Black Tot | Non-Black % | Difference in Rates | Strike Rate Ratio | Admin. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| McNair | Black | Black | 3 | 4 | 0.75 | 0 | 15 | 0.00 | 75 pts. | Infinite | Castille |
| Pierce | White | White | 14 | 17 | 0.82 | 4 | 22 | 0.18 | 64 pts. | 4.53 | Castille |
| Rhoads | Black | White | 7 | 13 | 0.54 | 2 | 15 | 0.13 | 41 pts. | 4.04 | Abraham |
| Richardson | Black | Black | 8 | 13 | 0.62 | 4 | 14 | 0.29 | 33 pts. | 2.15 | Rendell |
| Scott | Black | Black | 1 | 4 | 0.25 | 2 | 17 | 0.12 | 13 pts. | 2.13 | Abraham |
| Welsh | White | White | 5 | 11 | 0.45 | 8 | 20 | 0.40 | 5 pts. | 1.14 | Castille |
| Williams-C | Black | Black | 5 | 11 | 0.45 | 0 | 13 | 0.00 | 45 pts. | Infinite | Castille |
| **TOTALS** | | | **182** | **293** | **0.621** | **81** | **434** | **0.187** | **43.5 pts.** | **3.328** | |
| **TOTALS (excluding 2/19/92)** | | | **181** | **288** | **0.628** | **80** | **430** | **0.186** | **44.2 pts** | **3.378** | |
| **ALL OTHER CASES** | | | **172** | **276** | **0.623** | **71** | **391** | **0.182** | **44.2 pts** | **3.432** | |

\* Petitioner has information on the race of eight jurors struck in the <u>Tilley</u> case, five black and three non-black, but no information on the race of other jurors in that case.

21

36.     Thus, in addition to the non-statistical circumstantial evidence described above, the information now available from the researchers demonstrates the trial prosecutor's pattern and practice at the time of the trial in this case of exercising peremptory challenges to exclude African Americans from jury service and supports an inference of discriminatory intent under Batson.

### E.     The Philadelphia District Attorney's Historical Pattern and Practice of Discrimination in Capital Cases

37.     The United States Supreme Court has long held that extrinsic evidence of the exclusion of black jurors in other cases is admissible as evidence of a prosecutor's discriminatory intent. E.g., Batson at 94-95 ("Proof of systematic exclusion . . . raises an inference of purposeful discrimination because the 'result bespeaks discrimination.'" (quoting Hernandez v Texas, 347 U.S. 475, 482 (1954))); Akins v. Texas, 325 U.S. 398, 403-404 (1945) ("A purpose to discriminate . . . may be proven by systematic exclusion of eligible jurymen of the proscribed race"); Snowden v. Hughes, 321 U.S. 1, 8-9 (1944) ("Thus the denial of equal protection by the exclusion of negroes from a jury may be shown by extrinsic evidence of a purposeful discriminatory administration of a statute fair on its face."); see also Riley v. Taylor, 277 F.3d at 280-84 (prosecutor's office's strikes in other cases relevant to Batson inquiry).  Indeed, prior to Batson, such proof was not only admissible, it was required.  Swain v. Alabama, 380 U.S. 202 (1965).[22]

---

[22] In Swain, the United States Supreme Court held that to present an equal protection challenge for the prosecution's discriminatory exercise of peremptory challenges, "the defendant must . . . show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time."  Swain, 380 U.S. at 227; Ford v. Georgia, 498 U.S. 411, 420 (1991) ("[t]o prevail on . . . an equal protection claim under Swain, . . . a defendant must show a pattern of racial discrimination in prior cases as well as in his own."  See also Trevino v. Texas, 503 U.S.

38.    "Statistical analyses have served and will continue to serve an important role as one indirect indicator of racial discrimination . . . , particularly where, as in the case of jury service, the duty to serve falls equally on all citizens." Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620 (1974); Batson, 476 U.S. at 104 (citing Dallas County prosecutors' peremptory strikes in 100 felony trials in 1983-1984, and a comparison of the likelihood that a qualified black would sit on a jury (1 in 10), compared to a white (1 in 2), as proof of "the utter unconstitutionality" of abusing the peremptory challenge to exclude black jurors). But both statistical and *other* evidence depicting the systematic peremptory exclusion of African American jurors is admissible.[23]

39.    The evidence in this case includes a policy and practice of discrimination in jury

---

562, 566-67 (1992) ("the standard of proof for an equal protection violation under Swain required a showing of racial exclusion in 'case after case'" (quoting Swain, 380 U.S. at 223)); McCullom v. Georgia, 505 U.S. 42, 47 (1992) (Swain equal protection violation requires "proof of systematic exclusion of African-Americans through the use of peremptories over a period of time").

[23] E.g., Ford v. Norris, 67 F.3d 162, 166 (8th Cir. 1995) (defendant presented statistical evidence concerning composition of county venires and prosecutorial peremptory challenges over an 11-year period and affidavits and testimony from local criminal defense attorneys concerning prosecutor's jury selection practices); Miller v. Lockhart, 65 F.3d 676, 679-82 (8th Cir. 1995) (same); Jackson v. Herring, 42 F.3d 1350, 1357 (11th Cir. 1995) (defendant "presented compelling anecdotal and statistical evidence depicting the systematic exclusion of blacks from Tuscaloosa County juries," including statistical evidence of disproportionate office-wide pattern of strikes against blacks over 5-year period and testimony of trial prosecutor, another former prosecutor, and experienced criminal defense lawyers concerning pattern of prosecutorial strikes); Horton v. Zant, 941 F.2d 1449, 1454-59 (11th Cir. 1991) (defendant presented statistical evidence of jury strikes in other cases tried by trial prosecutor from counties in which statistically significant evidence was available; evidence of prosecutor's "hardball tactics" to avoid review of jury discrimination claim in another case; and evidence of "now infamous" memorandum prosecutor had prepared seeking to underrepresent blacks and women on local juries); Wright-Bey v. State, 444 N.W.2d 772, 775 (Iowa 1989) (testimony of lawyers who "had substantial contacts with criminal trials in Black Hawk County").

at every point in that case where you are. In other words, the 40 come in -- you'll never get it just right. You don't want to look there or go, "Is there a black back there? Wait a minute. Are you a black guy?"

Jury Selection Training Tape at 66-67. This was so important that the tape advised young district attorneys to invent reasons to leave the courtroom to ascertain the racial composition of upcoming venirepersons:

> And if you lose track or you're not sure of what's going on or you want to -- you can always take a recess.
>
> Because a lot of times what they do is they'll like have the next group -- the court officers want to set them up. Like remember in that method I told you earlier where they have -- now we've picked five, so they're going to bring seven more in. Usually they'll have the next seven sitting right out there in order. So you can see -- you can say, "Judge, I have to go to the bathroom." You can go out and see what's left and check out what's left, see what's you know -- because you know you got two strikes left. You want to know, look, you know, if the first two are going to be bad, I'm going to have to use strikes and the next ones will be good. But if they're two, you know, good ones coming up, then you know you're not going to strike them. And it changes your philosophy and your ability to make a decisions knowing what's coming up.

Jury Selection Training Tape at 67.

45.    This consciousness of the race-based nature of prosecutorial strikes, and the legal impropriety of such strikes, is evidenced by the tape's advice to the young prosecutors in how to create a pretextual race-neutral explanation for the strikes to satisfy Batson v. Kentucky:

> [I]n the future, we're going to have to be aware of [Batson], and the best way to avoid any problems with it is to protect yourself. And my advice would be in that situation is when you do have a black jury [sic], you question them at length. And on this little sheet that you have, mark something down that you can articulate later if something happens . . . .
>
> So if -- let's say you strike three blacks to start with, the first three people. And then it's like the defense attorney makes an objection saying that you're striking blacks. Well, you're not going to be able to go back and say, oh -- and make up something about why you did it. Write it down right then and there. . . .

26

And question them [the black jurors], say, "Well, he had a -- had a" -- Well the woman had a kid about the same age as the defendant and I thought she'd be sympathetic to him" or "She's unemployed and I just don't like unemployed people . . . .

. . . So sometimes under that line you may want to ask more questions of those people so it gives you more ammunition to make an articulable reason as to why you are striking them, not for race.

Jury Selection Training Tape at 69-71.[24]

---

[24]    The office's disregard for the constitutional limitations on prosecutorial conduct was further evidenced by the instructions to the trainees to ignore case law that forbids discrimination in jury selection. The Jury Selection Training Tape stated:

The case law says that the object of getting a jury is to get -- I wrote it down. I looked in the cases. I had to look this up because I didn't know this was the purpose of a jury. "Voir dire is to get a competent, fair, and impartial jury." Well that's ridiculous. You're not trying to get that.

Jury Selection Training Tape at 45. Indeed, the tape suggested to the Assistant District Attorneys that they would lose their jobs if they attempted to follow the law and choose fair jurors:

And if you go in there and any one of you think you're going to be some noble civil libertarian and try to get jurors, "Well, he says he can be fair; I'll go with him," that's ridiculous. You'll lose and you'll be out of the office; you'll be doing corporate law. Because that's what will happen. You're there to win . . . .

And the only way you're going to do your best is to get jurors that are as unfair and more likely to convict than anybody else in that room.

Jury Selection Training Tape at 45-46.

To the contrary, the Supreme Court has long made clear that the State's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935). The Court has also clearly stated that "the only legitimate interest [the State] could possibly have in the exercise of its peremptory challenges is securing a fair and impartial jury. . . . The State's interest in every trial is to see that the proceedings are carried out in a fair, impartial, and nondiscriminatory manner." J.E.B. v. Alabama, 511 U.S. 127, 137 n.8 (1994).

27

46.    The training tape also urged the prosecutors to adhere firmly to a set of practical

rules in selecting jurors.  As it explained:

> But the key is, just as in playing blackjack, is to stay by the rules . . . .
>
> And that's all I can tell you when you [sic] talk to you about this, is to play
> by certain rules and don't bend them and don't change them.

Jury Selection Training Tape at 3-4; id. at 60-62 ("I'm of the opinion you don't design a jury for

a particular case. . . . I think your goal is the same regardless of what kind of case you have. . . .

You pick the same jury.  I don't care if it's a black, white, Puerto Rican, Chinese or what.  You

pick the same jury. ").

47.    The Pennsylvania Supreme Court has held that "There can be no question that the

practices described in the transcript [of the videotape] support an inference of invidious

discrimination on the part of any proponent."  Commonwealth v. Basemore, 744 A.2d 717, 731-

32 (Pa. 2000).  The Court wrote (id. at 729):

> We have reviewed the transcript presented to determine the extent to
> which its contents, if established as accurate, would support [a jury
> discrimination] claim.  In the document:  the purpose of voir dire, namely, to
> select a fair and impartial jury, is denigrated as "ridiculous," in favor of the
> selection of jurors who will be biased in favor of conviction; various racial and
> gender stereotypes are described and offered as reasons to discriminate in the
> selection of jurors; techniques for accomplishing such discrimination are
> described in detail, including the maintenance of a running tally of the race of the
> venire panel and the invention of pretextual reasons for exercising peremptory
> challenges; and a willingness to deceive trial courts to manipulate jury panels to
> these ends is also expressed.

48.    Upon information and belief, while the District Attorney's office attacked the

lawyer featured on the training tape following its disclosure to the public, it never disavowed the

contents of the tape or the practices espoused therein during the period between the preparation

of the training session and the time of trial in this case.

49.    On the contrary, on August 14, 1990, another jury selection training session

conducted by the Philadelphia District Attorney's office ratified and espoused the practices set

forth in the 1987 training tape.[25] Notes from one of the assistant district attorneys who attended

the 1990 training indicated, *inter alia*, that the prosecutors were instructed that:

- "The ideal jury = 12 Archie Bunkers, will convict on little evidence."

- "If you wanted, you could strike almost all blacks. This gives you an advantage."

- "Avoid *Batson*: find an independent reason to strike them [black jurors] and keep a written record of it."

Loren Feldman, *I, the Jury*, PHILA. MAG. 21, 24 (June 1997). As with the 1987 training, the

1990 training instructed prosecutors to "keep[ ] a running count of how many blacks and white

remain in the jury pool." Id.

50.    The policies and/or practices expressed in the 1990 jury selection training

program have never been disavowed by Philadelphia prosecutors, and remained in effect at the

time of Petitioner's trial.

51.    Indeed, assistant district attorneys who prosecuted homicide cases have implicitly

acknowledged the policy to strike blacks. E.g., Diggs v. Vaughn, 1991 WL 46319, *1 (E.D. Pa.

Mar. 27, 1991) ("defense counsel at the trial which resulted in petitioner's convictions (which is,

after all, the trial with which we are concerned) repeatedly brought to the attention of the trial

judge his contention that the prosecutor was using peremptory challenges to exclude blacks from

---

[25] The August 14, 1990 training seminar featured Assistant District Attorney Bruce Sagel. Mr. Sagel was later named chief of the District Attorney's economic crimes unit by the present District Attorney.

the jury, in violation of petitioner's rights, and repeatedly sought a mistrial on that basis; and that the prosecutor did not then deny that such was her intention, or attempt to justify her use of peremptory strikes on any other basis."); Commonwealth v. Lark, Nos. 2012-13, 2015, 2021-22, Jan. Term, 1980 (C.P. Phila.), N.T. Jury Selection, 6/2/85, at 176-77 (assistant district attorney, confronted with a challenge to his systematic striking of black jurors responded sarcastically, "Oh, how awful"); Commonwealth v. Abu-Jamal, Nos. 1357-58, Jan. Term, 1982 (Phila. C.P.), PCRA N.T. 7/28/95, at 208 (testimony of former assistant district attorney Anthony Jackson that: "Trying cases in City Hall, I know most D.A.s, most homicides, will get rid of as many blacks as they possibly can, first to the death qualification and then peremptory. Actually, in the beginning of this trial in the jury selection I asked the judge to state the race of the jurors there for that very reason. I wouldn't have asked unless I thought it might be happening.").

52.    Furthermore, it has been known for years that the Philadelphia District Attorney's office peremptorily struck black jurors as a matter of policy at the time Batson was decided. Indeed, the late Justice Juanita Kidd Stout noted that it was "the practice" of the District Attorney's office to strike blacks from juries.   During the post-verdict motions in that case, Justice Stout stated:

> [U]nderstand that as one of the most active trial judges, I've seen this happen too
> often for my comfort and I do not – and I will not stand idly by and see it
> continue. [¶] . . . [I]n all cases I keep a record, and periodically throughout the
> selection of the jury I make the count, both as to the number and as to the race,
> and I admonish the respective attorneys, especially the district attorney, and I can
> say that I have noticed a practice – I will not say it is a policy – but I have noticed
> a practice which is sufficient to make this look suspicious to me.

Hardcastle N.T. 4/27/83, at 83-84.

53.    The testimony of defense counsel from the case of Diggs v. Vaughn, No. 90-2083

(E.D. Pa.), as well as affidavits of experienced Philadelphia defense counsel filed in this Court in

Hardcastle v. Horn, No. 98-CV-3028 (E.D. Pa.), also indicate that the Commonwealth had a

pattern and practice of striking African Americans from jury service on the basis of race.

54.    The history of Pennsylvania's interpretation of the Equal Protection Clause with

respect to the exercise of peremptory challenges helps to explain the Philadelphia District

Attorney's jury selection practices and also create an inference of discrimination in this case.

Prior to Batson, the District Attorney's office routinely and successfully struck jurors on the basis

of race.[26]  This policy and practice of race-based strikes consistently survived appellate review in

---

[26] E.g., Commonwealth v. Jones, 246 Pa. Super. 521, 522-24, 371 A.2d 957, 958 (1977)
(Philadelphia District Attorney's office excluded all 22 African Americans from jury -- 8 for
cause and 14 by use of peremptory challenges, exercising only one peremptory challenge against
white jurors; no Swain violation because "the presumption that the prosecutor exercised his
peremptory challenges in a proper manner is only overcome where the defendant produces
evidence that in case after case the prosecutor, despite the circumstances, is responsible for
the removal of all blacks from every jury."); Commonwealth v. Fowler, 259 Pa. Super. 314, 318,
393 A.2d 844, 846 (1978) (en banc) (Philadelphia District Attorney's office exercised
peremptory challenges to exclude all black jurors; no Swain violation because no evidence of
"systematic exclusion of Blacks by the Commonwealth"); Commonwealth v. Green, 264 Pa.
Super. 472, 473-75, 400 A.2d 182, 183-84 (1979) (Philadelphia District Attorney's office
exercised 17 peremptory challenges to exclude blacks from jury; no Swain violation because no
evidence presented "showing a pattern of discrimination"); Commonwealth v. Anderson, 302 Pa.
Super. 457, 464-65, 448 A.2d 1131, 1134-35 (1982) (rejecting claim that Philadelphia District
Attorney's office exercised peremptory challenges solely on the basis of race to empanel a jury of
10 whites and 2 blacks; record "clearly does not demonstrate the kind of systematic exclusion in
case after case of all black jury members" the court believed was necessary to prove Swain
violation); Commonwealth v. Edney, 318 Pa. Super. 362, 371, 464 A.2d 1386, 1390-91 (1983)
(in November Term, 1979, case, Philadelphia District Attorney's office exercised its peremptory
challenges to exclude all blacks from the jury; no Swain violation because "the mere proof that
all Blacks are excluded in a particular case, which is the extent of appellant's proof, is not
enough to overcome" the presumption that the prosecution's use of peremptory challenges "was
to obtain an objective and impartial jury"; "prejudicial exclusion of individuals from the jury . . .
does not amount to a denial of equal protection of the laws").

A number of federal cases also document the District Attorney's pattern and practice of
discriminatorily exercising peremptory challenges to strike black jurors. E.g., Harrison v. Ryan,

Pennsylvania's courts, see Commonwealth v. Henderson, 497 Pa. 23, 438 A.2d 951 (1981);

Commonwealth v. Brown, 490 Pa. 560, 417 A.2d 181 (1980); Commonwealth v. Martin, 461 Pa.

289, 336 A.2d 290 (1975), and the Pennsylvania Supreme Court itself erroneously believed that

it was constitutional to strike jurors based upon their race:

> [I]t is not constitutional error for a prosecutor to challenge a black juror for the
> reason that the prosecutor believes -- validly or invalidly -- that a black venireman
> because of the facts of the case, is less likely to be impartial than a white
> venireman. Put still more reductively, *the race, creed, national origin, sex or*
> *other similar characteristics of a venireman may be proper considerations in*
> *exercising peremptory challenges* when issues relevant to these qualities are
> present in the case.

Henderson, 497 Pa. at 30, 438 A.2d at 953.

   55.    Not surprisingly, the District Attorney's office was defending its discriminatory

strikes on the grounds that it could strike individual jurors on the basis of race, so long as it did

not systematically exclude all black jurors from service.[27]  Indeed, the trial prosecutor in

---

909 F.2d 84 (3d Cir. 1990) (in non-capital case tried in September 1982, the Philadelphia District
Attorney's office exercised 6 of 8 peremptory challenges to strike black venirepersons); Diggs v.
Vaughn, 1990 WL 117986, *1 (E.D. Pa. Aug. 8, 1990) (in 1977 murder prosecution,
Philadelphia District Attorney's office exercised 15 of 20 available peremptory challenges,
employing 14 to strike prospective black jurors and 1 to strike a prospective Puerto Rican juror);
McKendrick v. Zimmerman, 1990 U.S. Dist. LEXIS 12223 (E.D. Pa. Sept. 12, 1990) (in 1978
murder prosecution, Philadelphia District Attorney's office peremptorily challenged 4 of 5
prospective black jurors, and challenged the fifth for cause); cf. Sistrunk v. Vaughn, 90-CV-1415
(E.D. Pa. 1995).

   [27] In Martin, the Pennsylvania Supreme Court dismissed a challenge to the Philadelphia
District Attorney's exercise of peremptory challenges where the general venire contained ten
prospective black jurors, two were excused for cause, and the Philadelphia District Attorney's
office exercised eight of its fourteen peremptory challenges to exclude the remainder.  In dissent,
Justice Nix wrote:

> While I have great respect for the tradition of peremptory challenges, no tradition
> can be allowed to perpetrate injustice. Where, as here, it is apparent that the only
> available Black jurors were challenged peremptorily by the Commonwealth and

this case argued in the <u>Hardcastle</u> case, Hardcastle N.T. Court En Banc 4/27/83, at 30, that "[i]f it [the exclusion of African-American jurors] were systematic there would not have been any member of what appeared to be the black race on the jury."[28]

56.    The evidence, however, establishes that the city prosecutors' discriminatory exercise of peremptory challenges against black jurors continues to this day.  The Baldus and Woodworth study, referenced above, has documented the on-going pattern and practice of racial discrimination in jury selection by the Philadelphia District Attorney's office.  The study

---

the record of voir dire offers no basis for their rejection except race, it is, in my judgment, unreasonable to conclude that a presumption can justify a finding that the prosecutor's use of the challenge was only to obtain a fair and impartial jury. There is no justification for the use of a presumption to obscure fact.  Its only legitimate evidentiary value is to assist in determining truth.

<u>Martin</u>, 461 Pa. at 300, 336 A.2d at 295 (Nix, J., dissenting).

In <u>Brown</u>, the Court again rejected a challenge to the Philadelphia District Attorney's exercise of peremptory challenges to exclude blacks from the jury in the murder prosecution of a black defendant.  <u>Brown</u>, 490 Pa. at 569, 417 A.2d at 186.  Justice Nix noted in dissent that the "record in this case establishes that sixteen prospective jurors were excluded because of their race," and that the District Attorney's office had "only exercised sixteen peremptory challenges." <u>Id</u>. at 571, 417 A.2d at 187 (Nix, J., dissenting).  He characterized this exercise of peremptories to exclude blacks from the jury as an "invidious type of racism which should have no place in a court proceeding in the Commonwealth of Pennsylvania."  <u>Id</u>. at 574, 417 A.2d at 188.

Finally, in <u>Henderson</u>, the Philadelphia District Attorney's office had exercised peremptory challenges against all five black members of a thirty-seven person venire.  The prosecutor did not exercise any peremptory challenges against any of the prospective white jurors.  497 Pa. at 41, 438 A.2d at 960 (Nix, J., dissenting).  Justice Nix, in dissent, noted the prosecution's reliance on, and the undoubted effect of, the Court's decisions ignoring race-based exercises of peremptory challenges, stating:  "To all objective observers, it seems our prior decisions have encouraged prosecutors to use peremptory challenges to arrange the racial balance of juries to their benefit."  <u>Id</u>. at 46 n.8, 438 A.2d at 962 n.8.

[28]  To this Justice Stout responded:  "But you cannot put a token black on and say that this . . . absolves me or whatever. . . . [Y]ou cannot cure yourself by putting on that token black."  <u>Id</u>.

33

discloses that, where the race of prospective jurors is known or can be reliably imputed in capital

cases tried in the last three prosecutorial administrations, the District Attorney's office was more

than two-and-a-third times more likely (2.36) to peremptorily strike African Americans from jury

service than prospective non-black jurors.  The study reveals that, over this time period, the

District Attorney's office struck African Americans 55.28% of the time (1,209 strikes of a

possible 2,187 jurors), as opposed to a strike rate of only 23.43% for non-black jurors (749 of

3,196).

57.     This means that, over the entire time period covered by the study, an individual

juror who was African American faced odds of 1.24:1 of being the subject of a prosecutorial

peremptory strike, while non-black jurors faced odds of being struck that were only 0.31:1.

Thus, *the odds that an individual juror would be peremptorily struck by the Philadelphia District

Attorney's office increased by a factor of 4.04 if the juror was black.*

58.     Mr. Bracey was tried during the current prosecutorial administration, which

continues to strike African Americans at a grossly disproportionate rate.  From an analysis of

1,852 prosecutorial opportunities to strike jurors in homicide trials, the study discovered that

prosecutors in this administration struck African-American venirepersons 48.00% of the time

(360 strikes of a possible 750 jurors), while striking other venirepersons only 26.77% of the time

(295 of 1102).

59.     These discriminatory exclusions amount to a systemic pattern and practice of

peremptorily denying African Americans the right to participate as jurors, in violation of the

Sixth Amendment and the Equal Protection Clause of the United States Constitution.  See Swain

v. Alabama, 380 U.S. 202, 203-04 (1965) (the "purposeful denial to Negroes on account of race

34

of participation as jurors in the administration of justice" violates the equal protection clause);

Batson v. Kentucky, 476 U.S. 79 (1986).

60.    Given the policies and practices documented in the city prosecutors' training

sessions and the data accumulated by Professors Baldus and Woodworth, it is no surprise that the

federal courts have found numerous previous violations of the Equal Protection Clause of the

United States Constitution in homicide cases prosecuted by the Philadelphia District Attorney's

office.  See Jones v. Ryan, 987 F.2d 960 (3d Cir. 1993); Harrison v. Ryan, 909 F.2d 84 (3d Cir.

1990); Hardcastle v. Horn, 2001 WL 722781 (E.D. Pa. June 27, 2001) ; Diggs v. Vaughn, 1991

WL 46319 (E.D. Pa. Mar. 27, 1991); McKendrick v. Zimmerman, 1990 U.S. Dist. LEXIS 12223

(E.D. Pa. Sept. 12, 1990) (conviction procured by Chief of the Homicide Unit reversed on Batson

grounds); cf. Sistrunk v. Vaughn, 90-CV-1415 (E.D. Pa. 1995).[29]

### Good Cause Exists for the Discovery Requested

### A.    The "Good Cause" Standard

61.    A habeas petitioner is entitled to discovery if he can establish "good cause" for his

request.  Bracy v. Gramley, 520 U.S. 899, 908-09 (1997).  A petitioner establishes "good cause"

whenever "specific allegations before the court show reason to believe that the petitioner may, if

the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy, 520

---

[29]    In Sistrunk, Prosecutor Barbara Christie, former chief of the Philadelphia District
Attorney's homicide unit, and the prosecutor in Diggs and McKendrick, empaneled an all white
jury to try an African-American defendant. The District Court's grant of habeas corpus relief for
this Batson violation was reversed by the Third Circuit on procedural grounds. Sistrunk v.
Vaughn, 96 F.3d 666 (3d Cir. 1996).

U.S. at 908-09 (1997) (quoting <u>Harris v. Nelson</u>, 394 U.S. 286, 299 (1969)).[30] Under such

circumstances, discovery *must* be allowed -- "it is the *duty* of the courts to provide the necessary

facilities and procedures for an adequate inquiry." <u>Id</u>.[31]

62.    The United States Supreme Court has explained that "[t]he very nature of the writ

[of habeas corpus] demands that [habeas proceedings] be administered with the initiative and

flexibility essential to insure that miscarriages of justice within its reach are surfaced and

corrected." <u>Harris</u>, 394 U.S. at 291. This is never more so than in the context of capital cases, in

which the unique finality and irreversibility of the sentence require heightened procedural

safeguards. <u>E.g.</u>, <u>Turner v. Murray</u>, 476 U.S. 28, 35 (1986) ("The risk of racial prejudice

infecting a capital sentencing proceeding is especially serious in light of the complete finality of

the death sentence.").

63.    The purpose of post-conviction discovery "is to ensure that the facts underlying a

[habeas] claim are adequately developed." <u>Johnston v. Love</u>, 165 F.R.D. 444, 445 (E.D. Pa.

---

[30]    <u>Harris v. Nelson</u> led to the adoption of the Rules Governing Section 2254 Cases. In particular, the discovery provisions of Rule 6 are intended to be "consistent with <u>Harris</u>." Advisory Committee's Note on Habeas Corpus Rule 6; <u>Bracy v. Gramley</u>, 520 U.S. at 909.

[31]    <u>Accord</u> <u>McDaniel v. United States District Court</u>, 127 F.3d 886, 888 (9th Cir. 1997) (where Petitioner "presented specific allegations . . .[he] is entitled to discovery"); <u>Johnston v. Love</u>, 165 F.R.D. 444, 445 (E.D. Pa. 1996) (Rule 6's "history makes clear that its purpose is to ensure that the facts underlying a habeas corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." Accordingly, "a court may not deny a habeas corpus petitioner's motion for leave to conduct discovery if there is a sound basis for concluding that the requested discovery might allow him to demonstrate that he has been confined illegally."); <u>Gaitan-Campanioni v. Thornburgh</u>, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery is permitted only by leave of the court, the court should not hesitate to allow discovery, where it will help illuminate the issues underlying the applicant's claim.").

1996).  The Court must allow discovery whenever "a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief."  Id.  Accordingly, a court may not deny a petitioner's discovery motion "if there is a sound basis for concluding that the requested discovery might allow him to demonstrate" his entitlement to relief.  Id.

64.    Petitioner has good cause for the discovery he requests.

**B.    The Prosecutor's Notes of Jury Selection in This Case**

65.    Petitioner seeks discovery of any and all notes, documents, memoranda, or reports (including recorded on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession or control of the Commonwealth regarding the jury selection proceedings in this case.  Petitioner has good cause for this request.

66.    A prosecutor's notes are relevant in ascertaining the prosecutor's subjective intent in striking or excusing jurors and in reconstructing historical facts relating to the jury selection process.  E.g., Riley v. Taylor, 277 F.3d 261, 276-80 (3d Cir. 2001) (en banc) (prosecutor's notes show stated reasons were pretextual); Love v. Jones, 923 F.2d 816, 819-20 (11th Cir. 1991) (prima facie case supported by evidence that prosecutor kept notes of jurors' races).  Petitioner has good cause to believe that trial prosecutor Judith Rubino took notes of the jury selection and that those notes contain evidence relevant to proving Petitioner's claim of racial discrimination in the prosecution's exercise of peremptory challenges in this case.

67.    With respect to the relevancy of the notes, first, Petitioner is entitled to investigate and reconstruct the racial composition of the venire from which his jury was selected and the race of jurors accepted or stricken by the prosecution.  The prosecutor's notes of jury selection,

37

including any annotated copies of the court crier's jury sheets and the Philadelphia Court of Common Pleas computer print-outs of the general venire, are material to establishing the historic facts regarding the race of the general venire and of the jurors stricken or accepted by the prosecution.

68.    But apart from just the historical fact, Petitioner is entitled to investigate and present evidence of the prosecutor's *beliefs* about the racial composition of the venire.  Thus, to the extent that Prosecutor Rubino meant what she said in the Hardcastle case that "I don't know if the people I think are black are black" and that she struck certain jurors who "from my view were black," Hardcastle N.T. 4/27/83, at 44, 46, Petitioner is entitled to discover and explore the prosecutor's views about the historical fact of the race of the jurors accepted and stricken in this case.

69.    Second, Petitioner is entitled to present direct and/or circumstantial evidence of the prosecution's constitutionally improper exercise of peremptory challenges on the basis of race.  The prosecutor's notes are evidence of what factors Ms. Rubino took into consideration in accepting jurors or exercising peremptory strikes.  As such, they evidence her discriminatory intent in striking jurors on the basis of race, as well as constituting evidence of the pretextual nature of any race-neutral explanations the Commonwealth may attempt to offer for its discriminatory strikes.  E.g., Holloway v. Horn, No. 00-CV-1757 (E.D. Pa. July 6, 2001) *(Discovery Order That Our Prior Order of 8/7/00 Denying Discovery Be Vacated to The Extent That The Commonwealth And Petitioner Shall Within 14 Days of The Date of This Order, Provide to Opposing Counsel And The Court Such Discovery Materials as They Have in Their Actual or Constructive Possession or Control Regarding The Racial Composition of The Entire*

38

*Venire, Etc.) (Van Antwerpen, J. ); <u>see also</u> <u>Commonwealth v. Spotz</u>, No. 269 - 1995 (Schuylkill C.P.), PCRA N.T. 10/5/2000, at 693 (Baldwin, P.J.) ("I think in view of current case law which has been in existence for sometime that the reasons for exercising peremptory challenges may be challenged.  The District Attorney should be on notice that their notes about the jury selection . . . may be admitted into evidence.").

70.    Petitioner has alleged in state court and alleges in these habeas corpus proceedings that the Commonwealth exercised its peremptory strikes in this case in a racially discriminatory manner to exclude African Americans from the jury.  He also alleges that the Philadelphia District Attorney's files in this case include notes of jury selection that:  (1) contain historic facts and/or the prosecutor's perceptions with respect to historic facts relating to the racial composition of the general venire as well as the race of jurors stricken or accepted by the prosecution, and (2) evidence the prosecution's subjective intent with respect to striking jurors on the basis of race.

71.    These constitute the requisite "specific allegations . . . show[ing] reason to believe that [Edward Bracey] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  <u>Bracy</u>, 520 U.S. at 908-09.

72.    Moreover, Petitioner has good cause to believe that the type of notes Petitioner seeks in fact exist.

73.    First, at all times pertinent to this claim, the Philadelphia District Attorney's office had a policy and practice of keeping track of the race of all potential jurors in homicide cases.  This is exemplified by statements made in internal jury selection trainings that have subsequently come to light.

74.    For example, Respondents' 1987 Jury Selection Training Tape, which reflects and/or describes jury selection policies and practices employed in by Philadelphia prosecutors in capital cases, clearly instructed prosecutors to take notes, both to "Count the blacks and whites[; y]ou want to know at every point in that case where you are," and to contemporaneously record pretextual explanations for juror strikes to combat precisely the type of challenge presented here. Jury Selection Training Tape at 66-67, 69-71.

75.    Similarly, Respondents' August 14, 1990 jury selection seminar instructed prosecutors to "keep[ ] a running count of how many blacks and white remain in the jury pool" and "Avoid *Batson*: find an independent reason to strike them [black jurors] and keep a written record of it." Loren Feldman, *I, the Jury*, PHILA. MAG. 21, 24 (June 1997).

76.    Second, pursuant to this policy and practice, homicide prosecutors in the Philadelphia District Attorney's office did in fact take notes of jury selection that exhibit a consciousness of race in the jury selection process. Holloway v. Horn, 161 F. Supp. 2d 452, 510 (E.D. Pa. 2001) (prosecutor's jury selection notes, ordered turned over in habeas discovery, included a list of the selected jurors, including information on race and gender, and "notes regarding 86 of the 87 venirepersons questioned"; "[f]or each potential juror, the notes include [*inter alia*] juror number; race and gender; . . . and occasionally, what may be construed as mental impressions of the ADA"); Sistrunk v. Vaughn, No. 90-CV-1415, Magistrate's Report & Recommendation (E.D. Pa. Aug. 10, 1995) (Powers, Chief M.J.) (prosecutor "maintained . . . painstaking notes which revealed upon examination a running tabulation of the number of blacks left on the jury after each challenge was exercised"); Diggs v. Vaughn, 1991 WL 46319, *1-2 (E.D. Pa. Mar. 27, 1991) (in three trials, "[t]he record demonstrates conclusively that, at each

trial, the prosecutor kept careful records of the race of each prospective juror, and a running tally of how many persons of each race remained on the venire for possible selection."); Commonwealth v. Hill, Nos. 0041-0045, 1839-1841 (Phila. C.P.) (prosecutor's jury selection notes, ordered turned over in discovery, identified race of jurors).

77.     Third, Petitioner knows -- for Respondents have admitted it in other cases -- that *this* trial prosecutor took jury selection notes that evidenced a consciousness of race in the jury selection process in capital cases that she prosecuted.  Hardcastle v. Horn, 98-CV-3028 (E.D. Pa.), *Response to Petitioner's Reply Brief* (filed January 2001) (admitting that prosecutor Judith Rubino's notes from 1982 prosecution contain information on race of jurors struck); Commonwealth v. Tilley, Nos. 1078-82, Dec. Term, 1985 (Phila. C.P.), *Commonwealth's Motion to Reconsider Discovery Order*, at 2 ¶ 1 (August 20, 1999) (admitting that "[a] review of the Commonwealth's file reveals that there are personal hand-written notes of the prosecutor that contain information pertaining to the racial composition of the jury panel").

78.     Such notes are in Respondents' actual or constructive possession and/or control and are necessary for full and fair presentation of this claim.  Petitioner is entitled to their discovery.

**B.     The Prosecutor's Notes of Jury Selection in Other Capital Cases**

79.     Petitioner seeks discovery of any and all notes, documents, memoranda, or reports (including recorded on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession or control of the Commonwealth regarding the jury selection proceedings in any other homicide cases prosecuted by Judith Rubino, the trial prosecutor in this case.

80.     As demonstrated earlier in this motion, the trial prosecutor's jury selection

41

practices in other cases is relevant and material to a <u>Batson</u> claim. <u>See</u> Part ___, *supra*. And as demonstrated immediately above, Petitioner knows that such notes exist in at least two other capital cases prosecuted by Ms. Rubino and he has good cause to believe that they exist for all of the capital cases she prosecuted.

81.     Such notes are in Respondents' actual or constructive possession and/or control and are necessary for full and fair presentation of this claim. Petitioner is entitled to their discovery.

C.     <u>**Evidence of Respondents' Jury Selection Policies and Practices**</u>

82.     Petitioner seeks discovery of any and all notes, documents, memoranda, or reports (including recorded on paper, audiotape, videotape, electronic, or other form) in the actual or constructive possession or control of the Commonwealth regarding the jury selection policies and practices of the Philadelphia District Attorney's office during the years in which the trial prosecutor, Judith Rubino, has served as a homicide prosecutor in that office.

83.     As demonstrated earlier in this motion, the jury selection policies and practices of a prosecutorial office -- and not just records limited to the trial prosecutor -- are relevant to assessing the actual practices of the trial prosecutor in a given case. <u>See</u> Part ___, *supra*. Respondents have on at least two occasions since the <u>Batson</u> decision conducted training sessions that advocate the discriminatory exercise of peremptory challenges. In addition, history, the observations of Philadelphia judges, former prosecutors, and defense lawyers provide evidence of a policy and practice of the discriminatory exercise of peremptory challenges by Respondents. And statistical evidence encompassing three prosecutorial administrations indicates a widespread, systemic practice of discriminatory exercise of peremptory challenges by

42

43