# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD BRACEY, **F I L E D**              CIVIL ACTION
    **Petitioner,**                              :

    v.    OCT 2 8 2002 :              (CAPITAL CASE)

         MICHAEL E. KUNZ, Clerk

JEFFREY BEARD, et al.,       Dep. Clerk No. 02-CV-3685
    **Respondents.**                         :

## RESPONSE TO PETITIONER'S MOTION FOR DISCOVERY

Petitioner Edward Bracey is a death-sentenced Pennsylvania prisoner. On

February 4, 1991, he shot and killed Officer Daniel Boyle, who had joined the

Philadelphia Police Department only a few months before. Officer Boyle was sitting in

his police cruiser when the shooting took place. Petitioner was linked to the crime by

both physical evidence and eyewitness testimony, as well as by his own detailed

confession; there is no colorable argument that he is innocent of this crime.

Petitioner took a direct appeal after his conviction, and later litigated a petition for

collateral review under the Pennsylvania Post-Conviction Relief Act ("PCRA"), 42 Pa.

C.S.A. §§ 9541 *et seq.* The Pennsylvania Supreme Court affirmed the denial of PCRA

relief on December 31, 2001. Bracey has not yet filed a federal habeas petition. He has,

however, asked this Court to grant him wide-ranging pre-petition discovery regarding the

selection of his jury; he insists that the prosecutor in his case engaged in racial

discrimination. Petitioner's theory seems to be that the Philadelphia District Attorney's

Office, and in particular the prosecutor who tried his case, *always* engage in racial

discrimination, so it must have happened here, too. In order to support this theory,

petitioner asks not only for relevant documents pertaining to this case, but to *all* cases tried by this prosecutor -- Judith Rubino -- and indeed to *all* cases tried by *all* prosecutors while Ms. Rubino has been in this office.

Petitioner makes these broad allegations and requests out of necessity. As explained below, the record shows that the prosecutor absolutely did not discriminate in the selection of this multi-racial jury. The trial court *rejected* petitioner's allegations that Ms. Rubino was discriminating against blacks in her use of peremptory challenges. Indeed, petitioner abandoned this argument on appeal, presumably because there was nothing to support it. Several years later, when petitioner attempted to resurrect a jury discrimination argument in his PCRA action, the Pennsylvania Supreme Court found it waived. But now, petitioner has re-invented this claim, in an unrecognizable form, claiming systemic discrimination and seeking the opportunity to put the District Attorney's Office on trial.

Petitioner should not be allowed this free-ranging discovery. Pre-petition habeas discovery is generally not permitted. This rule certainly should not be suspended here, where the trial court *rejected* his jury discrimination claims, his appellate counsel *waived* this claim, and his PCRA counsel *waived it again*, by failing to properly present his claim that his appellate counsel was ineffective for abandoning it. Even if these waivers are ignored -- along with the clear lack of any discrimination in *this* case -- the claim presented to the state courts is *completely different* from the claim that petitioner proposes to forward here. It is improper to grant broad discovery on new claims in federal habeas corpus. The motion for discovery should be denied. See Abu-Jamal v. Horn, 2001 WL 1609690, *109 (E.D. Pa. ) (rejecting Abu-Jamal's request for discovery

based on McMahon videotape and "statistics" from other cases prosecuted by Philadelphia District Attorney).

There is one more important wrinkle to this case. A few months ago, in <u>Atkins v. Virginia</u>, 122 S. Ct. 2242 (2002), the Supreme Court held that executing a mentally retarded individual violates the Eighth Amendment's prohibition of cruel and unusual punishment. The Court did not create a procedure for determining whether a particular defendant is retarded; rather, the Court stated, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." <u>Id.</u>, 122 S. Ct. at 2250.

On August 16, 2002, petitioner filed a PCRA petition in the Philadelphia Court of Common Pleas, claiming that he is mentally retarded and requesting relief under <u>Atkins</u>. That action is currently pending, and is listed for a status hearing on January 16, 2003. A number of other death-sentenced Pennsylvania prisoners have also filed for relief under <u>Atkins</u>. Pennsylvania has not yet adopted standards for resolving such claims. There are two efforts now underway to develop these standards: First, the general assembly is currently considering legislation to set <u>Atkins</u> standards and procedures; second, several death-sentenced prisoners (including petitioner) have filed petitions with the Pennsylvania Supreme Court, asking that the Court make these determinations.

For purposes of this motion, the important point is that petitioner has a claim currently pending before the state courts. This latest petition for state collateral review is properly filed, because it arises from a new rule of constitutional law, and because it was initiated promptly after the Supreme Court decided <u>Atkins</u>. As a result, petitioner's state court litigation is not yet complete. It makes sense to wait for the resolution of

petitioner's Atkins/PCRA claim before commencing this federal action. See Bell v.

Cockrell, 2002 WL 31320536 (5th Cir. 2002) (federal habeas petitioner who brings

Atkins claim must first return to state courts); Hill v. Anderson, 300 F.3d 679, 681-82 (6th

Cir. 2002) (same); see generally Edelbacher v. Calderon, 160 F.3d 582 (9th Cir. 1998)

(petitioner must await the outcome of state proceedings before bringing a federal action).

If petitioner chooses to go forward *before* his Atkins claim is decided, then any future

federal habeas petition will be subject to the successive petition restrictions of 28 U.S.C.

§ 2244(b)(2). As a result, if the state courts reject his Atkins claim, he may well be

unable to present it to the federal courts in a second habeas petition.

     The motion for pre-petition and pre-exhaustion discovery should be denied.


# DISCUSSION

**Discovery is significantly restricted in habeas actions; petitioner has not met the standard for allowing new factual development.**


     "A habeas petitioner, unlike the civil litigant in federal court, is not entitled to

discovery as a matter of ordinary course." Peterkin v. Horn, 30 F. Supp.2d 513, 516

(E.D. Pa. 1998), citing Bracy v. Gramley, 520 U.S. 899, 117 S. Ct. 1793, 1796-77 (1997).

Under Rule 6 of the Rules Governing Section 2254 Cases, discovery may be had only

upon leave of court "for good cause shown."

     In particular, pre-petition discovery -- that is, before the habeas petition has been

filed -- is extremely disfavored. Indeed, several courts have held that there is *no such

thing* as pre-petition discovery in federal habeas corpus. See Calderon v. United States

District Court for the Northern District of California (Nicolaus), 98 F.3d 1102 (9th Cir.

1996), <u>cert. denied</u>, 520 U.S. 1233 (1997); <u>Orbe v. True</u>, 201 F. Supp.2d 671 (E.D. Va.

2002). The Ninth Circuit has even warned that orders granting such discovery are subject

to *mandamus*. <u>Nicolaus</u>, 98 F.3d 1102; <u>Calderon v. United States District Court for the</u>

<u>Northern District of California (Hill)</u>, 120 F.3d 927, 928 (9th Cir. 1997). <u>See also</u>

<u>Mayberry v. Petsock</u>, 821 F.2d 179, 186 (3d Cir.) ("habeas is not a general form of relief

for those who seek to explore their case in search of its existence"; discovery not

available for new and unexhausted claims), <u>cert. denied</u>, 484 U.S. 946 (1987).

The limited availability of discovery in habeas actions is made necessary by

principles of comity and federalism, which lie at the heart of habeas corpus. Habeas is

not the place for new and previously undeveloped claims. On the contrary, the state

proceedings are the "main event;" federal habeas is a mechanism for review of claims

already examined by state tribunals. <u>See generally</u> <u>Coleman v. Thompson</u>, 501 U.S. 722,

747-48 (1991) (explaining that "exhaustion" and "default" principles serve the interests of

finality, comity and federalism).

A corollary to these important principles is the requirement that **facts**, as well as

issues, be developed in state court. In <u>Keeney v. Tamaro-Reyes</u>, 504 U.S. 1, 11-12

(1992), the Court held that a habeas petitioner's failure to develop pertinent facts in state

court amounts to the default of his claim, which can be overcome only upon a showing of

cause and prejudice. The Court explained that the purpose of the exhaustion rule --that

is, the requirement that all habeas claims must first be presented to the state courts -- is

"to channel claims into an appropriate forum, where meritorious claims may be

vindicated and unfounded litigation obviated before resort to federal court." 504 U.S. at

10. The mere statement of a federal claim in state court does not serve this purpose --

rather, the claim must be fully and fairly presented to the state courts, and that means that the underlying facts must also be properly developed. Id.

The Keeney principle -- that the development of facts in state court is an important part of exhaustion analysis -- was further strengthened by the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996. Prior to AEDPA, the lower federal courts were free to ignore state court decisions on mixed questions of law and fact, and consider the underlying issues de novo. The new standard wisely reframes the inquiry and directs the federal habeas court to assess the reasonableness of the state court determination in light of governing Supreme Court precedent. See Terry Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000). This new standard serves to protect the important "presumption of finality and legality that attaches to a conviction at the conclusion of direct review." Calderon v. Coleman, 119 S. Ct. 500, 503 (1998) (citation omitted).

Under AEDPA, then, the subject of habeas review is the **resolution** of petitioner's claims in state court. If supporting facts were not presented to the state courts in the first instance, then petitioner is essentially asking the habeas court to resolve a new and different claim -- a task that is fundamentally inconsistent with AEDPA, and the interests of finality and federalism it was designed to serve. In Michael Williams v. Taylor, 120 S. Ct. 1479 (2000), the Court explained AEDPA's requirement that facts be developed first in state court:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. ... Federal courts sitting in habeas are not an alternative forum for trying facts and issues that a prisoner made insufficient effort to pursue in state proceedings.

6

120 S. Ct. at 1491.

Petitioner's request for discovery turns all these principles backwards. He contends that he should be able to develop facts as a first step, before he has shown that his claims were properly developed in state court, and that the underlying facts were also developed -- or, at the very least, that the failure to develop facts in state court was not attributable to him. But this approach is inconsistent with the fundamental principle that state courts must be given the first opportunity to resolve petitioner's constitutional claims. It is also plainly improper, because the claim Bracey now seeks to raise is completely different from the jury discrimination claim he raised in state court.[1]

### 1.   Bracey's present jury discrimination claim is entirely different from the one he raised in state court.

The jury discrimination claim that petitioner proposes to raise here is very different from the one he presented to the Pennsylvania Supreme Court. There, his argument was relatively simple: The prosecutor had used 10 of her 20 peremptory challenges to strike black jurors; because of the relatively low number of blacks in the venire, this was supposedly a high strike rate; and the reasons offered by the prosecutor for her challenges against African-Americans were either pretextual, or nonexistent. The

---

[1] Finally, respondents object to the discovery of the prosecutor's notes (if they exist) as attorney work-product. See Hickman v. Taylor, 329 U.S. 495, 510-11 (1947) (explaining theory and importance of work product privilege). A lawyer's notes, kept during the course of a trial, implicate the very essence of this privilege. See United States v. Edelin, 128 F. Supp.2d 23, 40 (D.D.C. 2001) (work product privilege protects prosecutor's impressions prepared in course of litigation).

entire argument took four pages (Brief for Appellant at 34-38, No. 240 Capital Appeal Docket, Pa.). The attack on Ms. Rubino's career, and the allegations of systemic discrimination by the Philadelphia District Attorney's Office, were combined into two footnotes (id. at 36-37 n.12 & 13).

As described below, this claim was rejected by the state courts as insufficiently developed. Even so, the claim raised here is very different, and far broader. Petitioner no longer concentrates on *his own* trial -- actually, the facts of his own *voir dire* are now merely a small part of his argument. But one of the basic principles of habeas law is that, as a prerequisite to federal review, petitioner must present the *same* claim -- "both facts and legal theory" -- to the state courts. O'Sullivan v. Boerckel, 119 S. Ct. 1728, 1731 (1999); McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) ("petitioner's state court pleadings and briefs must demonstrate that he has presented the legal theory and supporting facts asserted in the federal habeas petition in such a manner that the claims raised in the state courts are 'substantially equivalent' to those asserted in federal court"); Landano v. Rafferty, 897 F.2d 661, 669 (3d Cir.) ("substantial equivalence ... mean[s] that **both** the legal theory and the facts on which a federal claim rests must have been presented to the state courts"), cert. denied, 498 U.S. 811 (1990). Petitioner did not present these facts, or this legal theory, to the state courts. The "facts" underlying his claim of systemic discrimination are plainly new. As a legal matter, these allegations are derived from Swain v. Alabama, 380 U.S. 202 (1965), rather than Batson, and petitioner did not present a Swain/systemic discrimination claim to the state courts.

8

There is no reason why petitioner could not have presented this claim to the state courts. The statistics he relies upon could presumably have been generated years ago. See Commonwealth v. Lark, 746 A.2d 585, 589 n.4 (Pa. 2000) (information used by Professors Baldus and Woodworth to compile statistics of discrimination was in public record for years, and statistics could not therefore be considered "new evidence"). The training videotape prepared by Jack McMahon, a former assistant district attorney, was released to the public in 1997 (aside from being irrelevant to this case). Petitioner's failure to properly present and develop these claims earlier, in state court, precludes discovery here. See Holloway v. Horn, 161 F. Supp.2d 452, 493 n.27 (E.D. Pa. 2001) ("neither the [McMahon] transcript nor the Baldus data are new evidence").

### 2.    Bracey's jury discrimination claim is procedurally defaulted, because he waived it in the state courts.

Petitioner abandoned his Batson claim on direct appeal. He revived it in his petition for state collateral review, but the PCRA judge rejected it as without any support in the record (PCRA Opinion at 4). On appeal from the denial of PCRA relief, the Pennsylvania Supreme Court held that the Batson claim was waived. Commonwealth v. Bracey, 795 A.2d 935, 940 (Pa. 2001). The Court also noted that petitioner had failed to properly develop an ineffectiveness claim based on appellate counsel's decision to drop the Batson issue -- the one-sentence catch-all allegation of ineffectiveness, supposedly applicable to all claims, was insufficient under Pennsylvania appellate practice. Id. at n.4. The state supreme court's finding of waiver creates a procedural default of the Batson claim in federal court. "When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there

9

is 'an absence of available State corrective process.' In such cases, however, applicants are considered to have procedurally defaulted their claims." Sweger v. Chesney, 294 F.3d 506, 522 (3d Cir. 2002) (citation omitted).

Pennsylvania capital defendants have repeatedly argued that there is no such thing as an adequate Pennsylvania procedural rule as applied to them. Respondents strongly disagree, and if a petition is actually filed in this case, respondents will address this issue more fully. For purposes of this motion, even if the Pennsylvania Supreme Court's attempt to apply its own rules of claim development is to be entirely ignored, discovery is still improper. If the state supreme court's decision is overlooked, that does not mean this Court is free to conduct a *de novo* review of the Batson claim. On the contrary, the trial court already made a series of factual determinations *rejecting* petitioner's allegations of jury discrimination. These findings are binding on federal habeas review. See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (deference to state court factual findings still applicable where state appellate court did not adjudicate claim on the merits); Liegakos v. Cooke, 106 F.3d 1381, 1386 (7th Cir. 1997) (state court factual and credibility findings cannot be disturbed under § 2254(e), even though § 2254(d) standard of review was inapplicable because claims were not adjudicated on the merits by state appellate court).

The following are several samples from the trial court's findings. With respect to venireperson Nettles, peremptorily challenged by the Commonwealth, the court stated:

> I can very well see somebody striking that person, first of all, because he appeared to be very thick-tongued and slow in his answers. I don't know whether he had a ready comprehension. ...

N.T. 2/7/92, 65-66. With respect to venireperson Betty Trusty:

> I agree with the Commonwealth. She was most reluctant, very, very hesitant, very disturbed about the possibility of

10

> imposing the death penalty. I think that, in itself, is
> sufficient to exercise a peremptory challenge, regardless of
> so-called race or color.

N.T. 2/10/92, 131. With respect to venireperson Daniel Rodriguez:

> Exceedingly slow. ... He hesitated for so long to decide
> how old he was ... I find that's an adequate basis for the
> exercising [of] a peremptory challenge.

N.T. 2/10/92, 140-41. With respect to venireperson Diana Townsend:

> I do believe [] it's a substantial basis [for a peremptory
> challenge] to say, I do not want somebody on my jury
> whose brother has been convicted of murder. ...

N.T. 2/11/92, 110. With respect to venireperson Ernestine Brisco:

> I think that the Commonwealth's reasons are well-founded,
> and that it was a proper basis for exercising a peremptory.
> There was an extremely long hesitation. ... I would say she
> would never go for the death penalty. ...

N.T. 2/13/92, 32.

These findings cannot simply be ignored. Petitioner seeks to reopen a question

which has already been decided -- there was no discrimination in the exercise of the

petitioner's peremptories. Discovery on this issue is improper.

### 3.    Bracey's jury discrimination claim is entirely meritless; he cannot create a constitutional violation where none occurred, by relying upon irrelevant and dubious extrinsic evidence.

The record reveals that the prosecutor did not strike a single venireperson on the

basis of race. The jury in this case was comprised of four black individuals and eight

white individuals (N.T. 2/6/92, 94; 2/29/92, 52, 85, 103). At least one of the four

alternates was black (N.T. 2/20/92, 78).[2] The prosecutor used half of her peremptory

challenges to strike white venirepersons from the jury. Finally, the prosecutor stated

---

[2] The race of the remaining alternates was not stated for the record.

11

race-neutral reasons for all but the first three strikes against black venirepersons, and the prosecutor's reasons for those strikes -- she did not offer them, because there was no objection made at the time -- are clear from the record. The trial court accepted all of the prosecution's stated race-neutral reasons.

Petitioner's discussion of the *voir dire* in this case is relatively short -- he devotes a much longer discussion to various statistical analyses, and "evidence" from other cases. But even his short discussion of *this* case is misleading. Defense counsel objected when the prosecutor struck the first black male from the jury. As the prosecutor noted, a black male juror had already been seated on the jury at that time (N.T. 2/7/92, 62-63). Moreover, at that point in the jury selection process, the prosecutor had peremptorily struck two white venirepersons from the jury, whereas defense counsel had struck eight white venirepersons and no black venirepersons from the jury.[3]

Despite these facts, petitioner tries to portray the trial judge as outraged over the prosecutor's attempts to discriminate. But this is not what happened. When defense counsel raised the objection, Ms. Rubino pointed out that although she had peremptorily challenged one black man, and allowed another to be seated, the defense had used all of its peremptories against whites (N.T. 2/7/92, 63-64). Nevertheless, the prosecutor offered to explain her strikes. The court took her up on the offer, explaining that though it might be unfair, as he saw it the law required the prosecutor to explain herself at the request of

---

[3] Petitioner states that the prosecutor struck "the first four black jurors she had the opportunity to select in this case" (Motion at 8). But the record shows that when Ms. Rubino first black male juror, another had already been seated (N.T. 2/7/92, 63-64).

the defense; the court also believed that that defense counsel could legally exclude white venirepersons:

> THE PROSECUTOR (Ms. Rubino): Your Honor, the Commonwealth has stricken the first black male that has been stricken, Mr. Nettles. There is already a black male seated. So it's obvious to me that there is no systematic exclusion. Whereas the defendant has used eight strikes, all of whom were white jurors. All of the males that have come up on the panel, all the white males have been stricken by the defense, except the one that's on the jury. So I think if it's any systematic exclusion, it's being done by -- against, not by, the Commonwealth. If the Court wants a reason, why I --
>
> THE COURT: I want a reason. Because the law, as we all know, is not equally structured. The statute of the lady of justice with her eyes blindfolded and the scales equally set is very inaccurate. Besides, as far as this is concerned, because they strike white persons, it's not legally recognizable.
>
> So give me -- I want to know why you struck this person.

N.T. 2/7/92, 63-64. As it turns out, the court was not correct about the law: the prosecutor need not furnish explanations whenever the defense demands it, and defense counsel *may not* exclude jurors, including whites, because of their race.[4] In any event, the trial court did not hold that the defense had made a *prima facie* showing of discrimination by the prosecutor. The court was simply ensuring a full record in this contentious case, because the court believed (incorrectly) that the law gave defendant the

---

[4] Georgia v. McCollum, 505 U.S. 42 (1992) (criminal defendants cannot engage in purposeful discrimination based on race); Commonwealth v. Garrett, 689 A.2d 912, 917-18 & n.4 (Pa. Super. 1997), appeal denied, 701 A.2d 575 (Pa. 1997) (defense counsel's use of five out of six peremptory challenges to exclude white venirepersons from petit jury established *prima facie* case of discrimination under Batson).

right to demand an explanation of any particular peremptory strike, and that it prohibited discrimination by the prosecution but not the defense.[5]

Once the court asked the prosecutor to explain a peremptory challenge -- which she did -- petitioner complains that the court should have required her to explain her *previous* strikes, which were not objected to (Motion at 9). But there are plain race-neutral reasons for those strikes apparent from the record, all of which have been approved by Pennsylvania courts. The prosecutor obviously exercised a peremptory against venireperson Diana Richardson (Juror #1) because her husband had been convicted of murder, and had been released from jail just three years earlier (N.T. 2/5/92, 50-64). See, e.g., Commonwealth v. Smulsky, 609 A.2d 843 (Pa. Super.), appeal denied, 616 A.2d 984 (Pa. 1992) (prosecutor properly struck venireperson whose son had been convicted of a crime). The next venireperson in question, Bertha Gause (Juror #3), worked as a security guard -- a fact that has been specifically upheld as a race neutral explanation for a prosecutor's peremptory strike. See, e.g., Smulsky, 609 A.2d at 845 (prosecutor's challenge of security guard proper; such individuals have often been unsuccessful in attempts to join law enforcement, and may harbor negative feelings toward police or prosecutors). The prosecutor also struck Pauline Arrington (Juror #38), who had hesitated twice when the trial judge asked her if she could impose the death penalty in the appropriate case (N.T. 2/7/92, 35-36). See Commonwealth v. DeHart, 516

---

[5] The trial judge's mistaken view of the law was clarified several days later, as the *voir dire* wore on. Defense counsel objected to another prosecution peremptory; the judge required the prosecutor to provide an explanation, not because there had been any showing of discrimination, but because the judge believed *the defense had a right to demand an explanation* (N.T. 2/13/92, 30-31).

14

A.2d 656 (Pa. 1986), cert. denied, 483 U.S. 1010 (1987). Finally, petitioner complains

that the prosecutor never explained her challenge to James Earl -- he refers to this

venireperson as "juror 115 Earl James, II" although in the transcript this person is

identified as James Earl, juror no.6. (N.T. 2/13/92, 163). Defense counsel did not object

to this particular peremptory, so it is not surprising that the prosecutor was not asked to

explain it. In any event, this venireperson also worked as a security guard (N.T. 2/13/92,

169).

### A.    Statistical arguments derived from this case

Petitioner does not devote much time to discussing the back-and-forth of *voir*

*dire*, probably because there is nothing to support his discrimination claim. Instead, he

relies upon a complicated series of self-serving statistics, many of which are largely

unexplained. These statistics depend on information that is *not in the record*, and

therefore this entire argument is improper. Habeas, after all, is not the appropriate forum

for entirely new off-the-record "facts." While time and resource constraints prevent a

further comprehensive response at this pre-petition stage, there are several obvious

problems here:

- All of these statistical devices ultimately depend on the accuracy of petitioner's

race-determining methods. He asserts that his experts assigned a race to unknown

venirepersons based on the neighborhood they lived in, or whether they had the same

name as people who appear in voter registration rolls. These are obviously not precise

measures. Petitioner, however, claims that his experts have declared themselves to be

"98%+ valid," Motion at 17 n.16, although where this particular number came from is

unclear. (It is not surprising that the defense experts, rather than independent observers,

15

have declared their own accuracy.)  We also know nothing about the way the data was collected, by whom, and whether its accuracy was ever checked.

- Even generously assuming that the underlying numbers are accurate, the figures are still misleading.  For example, in his first statistical argument (Motion at 10-11), petitioner does not take into consideration the entire jury selection process -- he only counts jury selection up to February 19, 1992, even though the *voir dire* continued afterwards.  Apparently, the prosecutor's acceptance of several *additional* black jurors after that point is not relevant.  In fact, petitioner seems to believe that these later-seated jurors provided evidence of the prosecutor's racial bias, because the prosecutor was trying to cover up her earlier discriminatory selections.  This is nonsensical:  How can a prosecutor hide her bias against African-Americans by choosing African-American jurors?

- Petitioner avoids mentioning that the defense used almost all its peremptories to challenge whites.  If the defense was busy removing whites, then obviously there was a higher percentage of blacks left when the prosecution took its turn to exercise its challenges.  Thus, petitioner's comparisons of the racial makeup of the *venire* to the proportions of the prosecutor's challenges is woefully incomplete -- it is missing a step, because the defense was filtering out whites.  Furthermore, as a matter of strategy, both sides want to conserve their challenges.  The prosecutor knew that the defense was far more likely to remove white jurors; the prosecutor could easily have guessed that she didn't *need* to exercise a particular challenge against a white juror, because the defense was likely to do so.

- To bolster his argument, petitioner simply invents certain classifications of jurors. He tries to argue, for example, that the prosecution was biased against black women (Motion at 12), but that is not a class of persons protected under <u>Batson</u>.

Petitioner should not be rewarded for his attempts to manipulate not-of-record facts without explaining their reliability, in order to create a cloud of discrimination over his trial. There was no discrimination here; he should not be granted pre-petition discovery.

### B.    Attacks on the prosecutor from a selective list of other cases

Petitioner next attempts to destroy the reputation of his trial prosecutor. But the reliability of his evidence does not match the seriousness of his accusations. He lists 23 cases which Ms. Rubino prosecuted, and admits that they are but a small portion of her cases (Motion at 16 & n.15). Indeed, Ms. Rubino has been a homicide prosecutor for decades: she has prosecuted many hundred, if not a thousand, such cases. He provides no other information about these particular cases -- for example, he does not say whether the defendant, or the victim, or the witnesses were black. He then asserts that he has divined the race of some of the venirepersons in those cases by "cross-referencing" with voter registration rolls and census data, which again seems to mean that jurors and voters with similar names are presumed to be the same, and people in certain neighborhoods are presumed to be black. He also admits that, even with his own generous race-categorizing methods, he was unable to even guess at the rate of almost *twenty percent* of the venirepersons. Nevertheless, he assures this Court that he can reliably extrapolate his figures through unnamed statistical means, which once again he proclaims to be accurate.

17

These allegations, based on "evidence" that is not-of-record and dubious in the extreme, are clearly improper. There is no good reason to convert this proceeding into an inquisition into the practices of Prosecutor Rubino over many decades. There was no jury discrimination in this case, and Ms. Rubino's record of service -- serving *all* of Philadelphia, not simply one race or one neighborhood -- speaks for itself, despite petitioner's slanderous attempt to change the subject from the plain fairness of his own trial.

Finally, petitioner's attempt to capitalize on Judge Padova's decision in <u>Hardcastle</u> <u>v. Horn</u>, 2001 WL 722781 (E.D. Pa. 2001), should not benefit him here. First of all, this is simply an attempt to characterize Ms. Rubino as a serial discriminator -- in order words, if-she-did-it-there-she-did-it-here. But <u>Hardcastle</u> was a different case, with a different jury, and it proves nothing about *this* case. Indeed, the trial in <u>Hardcastle</u> took place before <u>Batson</u> was even decided; there is no reason to believe that the prosecutor acted with exactly the same intent despite the change in the law.

Moreover, with due respect, respondents believe that <u>Hardcastle</u> -- currently on appeal to the Third Circuit -- was an incorrect and even outrageous decision. The court's contradictory holdings reveal its eagerness to grant the writ: (1) the court held the state appellate courts were *prohibited* from deciding <u>Batson</u> claims through an independent review of the record, and *rejected* the findings of the Pennsylvania Supreme Court; then, in an about-face, the district court conducted its *own* independent review of the record, and came to the opposite conclusion; (2) the state courts *never asked* the prosecutor to explain the reasons for her peremptory challenges, indeed <u>Batson</u> had not even been decided at the time of trial -- yet the district court held that the absence of such reasons in

18

the record required a *presumption* that the prosecutor *did* discriminate; (3) the district

court's presumption of discrimination was unrebutted, and the district court *refused* to

allow the prosecutor to defend herself; (4) the district court's factual findings -- based on

the same independent review of the record that it held that state courts could *not* do --

were demonstrably false.[6] Hardcastle was wrongly decided, and certainly it provides no

help to petitioner.

Petitioner's other attempts to "prove" discrimination by Ms. Rubino are similarly

unconvincing. For example: Petitioner argues that if Ms. Rubino (or any other

prosecutor) keeps track of the race of venirepersons during jury selection, that is itself

evidence of discrimination. This is *absurd*. Trial lawyers routinely note all sorts of juror

characteristics in their notes, simply as a means of keeping track. It can be especially

helpful to keep a record of race, because Batson objections can be raised at any time --

even decades after the trial is over. Indeed, such notes may be the only way of

*disproving* racial bias. Further, petitioner does not explain how such notes can be an aid

to discrimination: why does a lawyer need a "list of juror's races" in order to exercise

bias? How does it make discrimination more likely?[7]

_____

[6] To take just one example -- Judge Padova found that two venirepersons were *identical* in their value to the Commonwealth as jurors, despite the fact that one knew a police officer involved in the case, and the other had no connection to law enforcement at all. See Brief for Appellants and Appendix, Vol. I., Hardcastle v. Horn, No. 01-9006 (3d Cir.), pp.47-57. The Commonwealth had every reason *not* to challenge the juror who knew the officer; Judge Padova's contrary conclusion is just wrong.

[7] Petitioner also repeats his accusation, first made in Hardcastle, that Ms. Rubino demonstrated bias by refusing to immediately acquiesce in defense challenges for cause without even an opportunity to rehabilitate venirepersons who hesitated to rule out unconscious prejudice in their own deliberations. This, too, is absurd. Jury selection is not an exact science -- that is why cross-examination is allowed in the first place. If a

If petitioner's allegations are closely examined, they are dubious indeed. He certainly has not shown entitlement to pre-petition discovery.

## C.    Petitioner's defaulted claims of systemic discrimination

Petitioner devotes a great deal of his argument to his theory that the Philadelphia District Attorney's Office has discriminated for decades. He claims that this is only a minor restatement of his <u>Batson</u> claim, but obviously it is not the same thing. Nothing like this was ever properly presented to the state courts, and petitioner should not be awarded discovery in aid of it here.

Petitioner identifies three general categories of "systemic" evidence. There is "anecdotal" evidence; a training tape made by a different Philadelphia prosecutor; and statistics. To briefly address these in reverse order: The statistical arguments are particularly weak. Petitioner does not precisely identify the time period in question, when the Philadelphia District Attorney's Office supposedly engaged in nonstop discrimination. Petitioner also does not describe his methodology in any helpful way, and he leaves unanswered many questions -- for example, how many cases he has studied, and what percentage of prosecutions have *not* been studied; what the race of the defendants were, or the victims, or the witnesses, in these cases; what was the racial composition of the empaneled juries; what was the racial makeup of the venires, or the community, or those venirepersons that the prosecution actually had an opportunity to

_____

prospective juror, for example, suggests that he might have an unconscious prejudice toward police officers, defense counsel are not required to drop all objections to a challenge for cause. On the contrary, a competent defense counsel will give the juror a chance to say that he or she could be fair -- to test the depth of the alleged bias.

challenge. The list could go on. Petitioner's reliance on untested, unexplained studies that are not in the record is improper.

In fact, the United States Supreme Court has already *rejected* similar statistical "evidence" of systemic discrimination. In <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987), Court examined a claim based upon an earlier study by the same Professor Baldus who authored the study petitioner now relies upon, and the Court found it entirely lacking. Even if such statistics were entirely accepted, the Court reasoned, the prisoner must still demonstrate that *his particular case* was infected by racism, a showing that petitioner has entirely failed to make. The extrinsic evidence is therefore simply irrelevant.

Furthermore, even if these statistics were relevant and the claim properly presented, that does not mean they are *admissible*. Before these figures could actually be considered, this Court would first have to determine that the methodology is sufficiently reliable to be introduced. <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 593-94 (1993) (setting out standards for assessing admissibility of expert evidence; relevant factors include whether methodology can or has been tested, whether techniques have been subject to peer review and publication, the methodology's error rate, and whether it has been generally accepted in scientific community). <u>See also</u> Tribe, <u>Trial by Mathematics: Precision And Ritual In The Legal Process</u>, 84 Harv. L. Rev. 1329, 1338 (1971) (wherein the author urges that statistical arguments must be clearly shown to be reliable before used in court). Petitioner's description of this "evidence" does not demonstrate its reliability. It has not yet met the admissibility test, and it certainly cannot justify a discovery request.

It is also problematic to offer "anecdotal" evidence of discrimination in support of this defaulted claim. For every anecdote suggesting the presence of jury discrimination, respondents could offer a story refuting it. But this is not the way litigation is decided. It certainly does not give petitioner the right to wide-ranging discovery so that he can make up a claim to go along with these handpicked personal observations.

Finally, Petitioner attempts to create a Batson claim where none exists by discussing a videotape made by former Assistant District Attorney Jack McMahon, Esquire, which contained Mr. McMahon's questionable views about jury selection (Motion at 22-28). The prosecutor in this case was not Mr. McMahon. Petitioner does not even offer to prove that the prosecutor in this case, a different member of the Homicide Unit, ever saw the tape, let alone adopted or agreed with any of its suggestions. Indeed, since this case was tried five years after the tape was made, plainly it is irrelevant to the claims here.

The McMahon tape is described by petitioner as representing the jury selection policy and practice of the office. This is false. The tape contains Mr. McMahon's personal approach to jury selection, and to Batson in particular; it did not represent the policy of the office. Upon discovering this videotape in 1997, this Office released copies of it to defendants who, unlike petitioner, were actually prosecuted by Mr. McMahon. The videotape, on its own, does not prove that a jury in any particular case tried by McMahon was improperly selected. These issues must be decided on a case-by-case basis.[8] The videotape does nothing to further petitioner's Batson claim in *this* case, tried

---

[8] The same problems afflict petitioner's reliance on "notes" from an anonymous assistant district attorney purportedly arising out of another training session with yet another

by a different prosecutor years after the tape was made. <u>See</u> <u>Abu-Jamal v. Horn,</u> 2001 WL 1609690, *109 (E.D.Pa.) ("the [McMahon] tape is irrelevant because its production occurred five years after petitioner's trial and because it relates to the views of McMahon, not those of [Abu-Jamal's prosecutor]"); <u>Holloway v. Horn</u>, 161 F.Supp.2d 452, *520 n.68 ("[McMahon videotape] has no bearing on this case") (E.D. Pa. 2001); <u>Peterkin v. Horn</u>, 988 F. Supp. 534, 541 (E.D. Pa. 1997) (existence of McMahon videotape did not help to prove <u>Batson</u> claim); <u>Commonwealth v. Bond</u>, 2002 WL 1958492, *12 (Pa. 2002) ("[McMahon] tape is not sufficient to establish a policy of discrimination in jury selection by the prosecutors in the District Attorney's Office of Philadelphia County"); <u>Commonwealth v. Rollins</u>, 738 A.2d 435, 443 n.10 (Pa. 1999) (same).

Neither Jack McMahon's observations on jury selection, nor various "anecdotes," nor unreliable and irrelevant "statistics," justify discovery in this case, where clearly there was no discrimination afoot during jury selection -- at least, not by the prosecutor.

---

prosecutor (Motion at 29).  Indeed, these quotations are offered without any context at all.

## CONCLUSION

Petitioner requests four kinds of pre-petition discovery:  (1) documents relating to jury selection in this case; (2) documents relating to Judith Rubino's jury selection in other cases; (3) documents relating to jury selection by the Philadelphia District Attorney's Office in the years during which Ms. Rubino has been a prosecutor here; and (4) documents relating to the training of assistant district attorneys in this office in the same time period.  All of these requests should be denied.

One can only assume that petitioner has made his more obviously overbroad requests (requests 2-4) as a matter of strategy.  Perhaps petitioner believes that, in comparison to these ridiculous discovery demands, the more limited request that is actually related to the case at hand may seem reasonable.  But that is not the way the system works.  Petitioner must justify each and every discovery request.  He cannot do so, because he has not even filed a petition yet, the claim he proposes to raise was not raised in state court, the Batson claim he did raise in state court was procedurally barred, the trial judge already made a series of factual findings that there was *no* discrimination, and petitioner's new allegations of systemic discrimination are irrelevant and unsupported.

Respectfully submitted,

THOMAS W. DOLGENOS
Chief, Federal Litigation

24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD BRACEY                                   CIVIL ACTION

        v.

JEFFREY BEARD, et al.                           NO. 02-3685



## CERTIFICATE OF SERVICE


    I, THOMAS W. DOLGENOS, hereby certify that on October 28,

2002, a copy of the foregoing pleading was served by placing

same, first class postage prepaid, in the United States Mail

addressed to:

            Billy Nolas, Esquire
            Defender Assn. of Phila.
            Suite 545 West--Curtis Bldg.
            126 South 6th Street
            Philadelphia, PA    19106




            THOMAS W. DOLGENOS
            Chief, Federal Litigation
            District Attorney's Office
            1421 Arch Street
            Philadelphia, PA    19102
            (215) 686-5703